**ROBERTSON et al. v. MAGNOLIA PETROLEUM CO. (No. 878.)** *

(Court of Civil Appeals of Texas. Beaumont. Oct. 18, 1923. Rehearing Denied Oct. 31, 1923.)

1. **Death ☞27—Action for exemplary damages for death occasioned by gross negligence of employer not barred by award under Workmen's Compensation Act.**

That compensation for the death of an employé has been made under the Workmen's Compensation Act (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1 to 5246—91) did not bar a suit for exemplary damages, where the death was occasioned by the gross negligence of the employer under article 5246—7, which is based on Const. art. 16, § 26, providing that every person, corporation or company that may commit homicide through willful act or omission, or gross neglect, shall be responsible in exemplary damages to the surviving husband, widow, or heirs, notwithstanding the claim of defendant that exemplary damages could not be recovered where plaintiffs were not entitled to actual damages.

2. **Death ☞76—Evidence insufficient to show gross negligence of employer in failing to use steam or air for ventilating place of work.**

In an action by a widow and heirs to recover exemplary damages under Vernon's Ann. Civ. St. Supp. 1918, art. 5246—7 for death of decedent through gross negligence of his employer, decedent losing his life because of an explosion in one of defendant's receiving houses due to a spark from a defective electric light cord, evidence *held* not to disclose gross negligence in defendant's failure to use steam or air for ventilation purposes.

3. **Death ☞76—Evidence insufficient to show gross negligence of employer in furnishing defective light cord causing explosion.**

In an action by a widow and heirs to recover exemplary· damages under Vernon's Ann. Civ. St. Supp. 1918, art. 5246—7 for death of decedent through gross negligence of his employer, decedent losing his life because of an explosion in one of defendant's receiving houses due to a spark from a defective electric light cord, evidence *held* not to disclose gross negligence on the part of decedent's employer in furnishing such defective light cord; it appearing that another employé had procured it without defendant's knowledge.

4. **Trial ☞139(1)—Whether evidence raises issue for jury is question for court.**

Whether there is any evidence raising an issue of fact for the jury is for the court.

5. **Trial ☞139(1)—Peremptory instruction for defendant proper where evidence insufficient to authorize finding for plaintiff.**

When the evidence is not sufficient in law to authorize a finding for plaintiff, the jury should be peremptorily instructed to find for defendant.

Appeal from District Court, Jefferson County; W. H. Davidson, Judge.

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error dismissed for want of jurisdiction December 20, 1923.

Action by Mrs. Pearl Robertson and others against the Magnolia Petroleum Company. Judgment for defendant, and plaintiffs appeal. Affirmed.

F. C. Vaughn, of Port Arthur, and Gordon, Lawhon & Pool, of Beaumont, for appellants.

Minor & Minor, of Beaumont, and A. S. Hardwicke, of Dallas, for appellee.

O'QUINN, J. April 1, 1920, J. M. Robertson, husband and father of appellants, was an employé of appellee, Magnolia Petroleum Company, and lost his life as the result of a gas explosion under one of appellee's receiving houses, where he was engaged in the discharge of his duties as such employé. Appellee was a subscriber under the Workmen's Compensation Act of Texas (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1 to 5246—91), and appellants received actual damages in the form of compensation under said Compensation Act for the death of said Robertson.

Mrs. Pearl Robertson, wife of J. M. Robertson, brought this suit in her own behalf and as next friend of her minor children, Reha Robertson, Wesley Robertson, and Vera Robertson, for the recovery of exemplary damages against appellee for the death of her said husband and father of the minor children. Her petition alleged that J. M. Robertson lost his life in said gas explosion because of the gross negligence of appellee; that it was the duty of said J. M. Robertson to repair and build pipe lines in and about the buildings, yard, and plant of appellee for the purpose of transporting oil to the different receiving houses, and that at the time of the accident the deceased was working in the basement of one of said receiving houses, the house being a two-story brick structure, and that the second story was used for the purpose of receiving tests of different oils through pipes from different stills, and that the first story of said house was the place where all the pipes running from the stills into the receiving house were received and assembled, the pipes coming through the basement into the first story, and that the entire structure, including the raised portion of the basement, was entirely inclosed, with two or three openings at the bottom, and that in the basement there was a cesspool, which received waste oils from leaking pipes, and that on the date of the accident this cesspool was full of oil and gas, all being of a highly inflammable and explosive nature; that on said date said Robertson, with other employés, was sent by appellee to repair certain leaking pipes in the basement of said receiving house, and that while in the discharge of said duty there was an explosion in said basement from which he received injuries causing his death. It was alleged that the basement in which deceased was at work

was dark, and that in repairing said leaking pipes it was necessary and customary for the employés to use an extension electric light cord attached to a socket on the outside of said receiving house; that said receiving house was so constructed that there was very little ventilation, and that the openings in same were so small that gas and oil were allowed to accumulate under said building in said basement, and that the accumulation of gas could have been prevented by sufficient ventilation, or by the use of compressed air, or by the use of steam jets; that the cesspool in said basement, at the time deceased was required to do said work, was full of gas and oil; that while deceased was engaged in said repair work it became so dark that it was necessary to secure a light, and that deceased and the other employés engaged with him in said work were supplied by appellee with an extension electric light cord which was defective in that the insulation thereon was worn and broken, and that, while using this defective cord, it struck or came in contact with one of the iron pipes, thereby causing a spark which ignited the gas which had accumulated in said basement, and causing an explosion which resulted in the death of said Robertson. It was alleged that appellee was guilty of gross negligence by reason of the manner in which said receiving house was constructed, in that sufficient openings were not made to allow the escape of the accumulated gases and oils, and in not providing compressed air or steam jets to dissipate the gas, and in not removing the accumulated gas and oil before directing deceased to work in said basement, and in providing deceased with a defective extension electric light cord, knowing the dangerous conditions under which it was to be used.

Appellee filed its plea in abatement alleging that it was a subscriber under the Workmen's Compensation Act, and held a policy of insurance under the provisions of said act, and that the deceased, Robertson, was an employé and covered by the provisions of said act and said policy of insurance, and that he met his death while in the discharge of his duties, and that by reason thereon appellants had no cause of action for actual damages against appellee, and having no legal claim for actual damages could not assert a right or claim for exemplary damages.

This plea was overruled by the court, and appellee then answered by general demurrer, several special exceptions, and specially answered that it was a subscriber under the provisions of the Workmen's Compensation Act of Texas, and that deceased, Robertson, was an employé, and that appellants had elected to accept compensation, and that they, therefore, were barred from asserting any claim for actual damages, and having no claim for actual damages they could not assert a claim for exemplary damages. It also

pleaded assumed risk, contributory negligence, and alleged that deceased knew of the conditions of the receiving house, and that it was part of his duties to keep said receiving house in proper condition and fix the pipes, and that he had the power and authority to make all necessary changes in same to make same safe, and that he also knew the condition of the extension electric light cord which was used at the time.

The case was tried before a jury, but at the conclusion of the evidence offered by appellants the court granted appellee's motion for a peremptory instruction in its favor, said motion and said instruction being based upon the ground that appellants failed to make out a case of liability for exemplary damages (failed to raise the issue of gross negligence) against appellee. Judgment was thereupon entered in favor of appellee, to which appellants excepted, and from which they have appealed.

We will first notice appellee's contention that the court erred in not sustaining its plea in abatement, contending that—

"Section 3, pt. 1, of the Workmen's Compensation Act of Texas, having taken from the employés of a subscriber their right of action for damages for personal injuries, and from the representatives and beneficiaries of deceased employés their right of action against such subscribing employer for damages resulting in death, section 7, pt. 1, of said act, wherein it is attempted to create a right of action for exemplary damages in favor of the class named therein for homicide occasioned by the gross negligence of the employer is of no effect for the reason that exemplary damages cannot be recovered unless actual damages may be recovered, and as the right of action for actual damages is denied the beneficiaries of a deceased employé, no action may be maintained for exemplary damages by the representatives of beneficiaries of a deceased employé."

In answer to this contention, appellants say that their cause of action is authorized by article 5246—7, Vernon's Statutes, which is based upon and is but the re-enactment of section 26 of article 16 of the Constitution of Texas, which reads:

"Every person, corporation or company, that may commit a homicide, through willful act or omission, or gross neglect, shall be responsible, in exemplary damages, to the surviving husband, widow, heirs of his or her body, or such of them as there may be, without regard to any criminal proceeding that may or may not be had in relation to the homicide."

The gist of this point of contention by appellee is that as exemplary damages cannot be had except where actual damages may be recovered, and that as the deceased was an employé within the Compensation Act and covered by the policy carried by appellee, and that as appellants, under said law, were entitled to and did receive actual damages in the form of compensation, therefore they can-

not maintain this separate action for exemplary damages against appellee, since they are not entitled to and cannot recover herein actual damages, notwithstanding article 5246—7 of the Compensation Act.

[1] We think appellee's contention should be overruled. It is well settled that where actual damages are not recoverable, exemplary damages cannot be. However, we take it that means that where the cause of action asserted, as shown by the facts adduced to support same, is not sufficient to support a recovery of actual damages, then no recovery of exemplary damages can be had, and not that both must invariably be recovered in the same suit. When actual recoverable damages have been sustained and settled for, without including any claim for exemplary damages, the recovery of the former is not a prerequisite to a recovery of the latter in a suit for that purpose. Gregory v. Coleman, 3 Tex. Civ. App. 166, 22 S. W. 181. In the case cited, it is said:

"It may be conceded, in a case where there has been no payment or satisfaction of actual damages, that a recovery of exemplary, without also recovering actual, damages would not be [supported], but when actual recoverable damages have been sustained and settled for, without including in the settlement the claim for vindictive damages, recovery of the former, whether nominal or substantial, is not believed to be prerequisite to a recovery of the latter."

Besides, the statute, article 5246—7, expressly reserves the right to sue for exemplary damages where the death of the employé is brought about by the gross negligence of the employer. This statute is in consonance with the well-established rule of law that for exemplary damages to be recoverable actual damages must also be recoverable, for, where the death of the employé is from an accident arising in the course of his employment, then actual damages are provided by statute, and the permission to sue the employer for exemplary damages arising out of the same injury, in a proper case, does no violence to the rule.

While appellants have presented several assignments of error and propositions thereunder, they all go to the one question:

"Was there sufficient evidence to submit to the jury the issue of whether appellee was guilty of gross negligence which resulted in the death of J. M. Robertson?"

The court held as a matter of law that the evidence did not raise the issue.

Appellants make no contention that they are entitled to exemplary damages upon any other ground than gross negligence.

"Gross negligence, to be the ground for exemplary damages, should be that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the rights or welfare of the person or persons to be affected thereby." Railway Co. v. Shuford, 72 Tex. 165, 10 S. W. 408; Cotton Press v. Bradley, 52 Tex. 600.

John Dailey testified:

"I am employed by the Magnolia Petroleum Company. * * * I am familiar with the conditions at the Magnolia Refinery with reference to the receiving houses and the way they were constructed, and I was familiar with them about April 1, 1920. I work around the receiving houses all the time. My duties was repairing. We worked from one to five or eight or nine batteries. That was our duty. My duties called me in the receiving houses and about them. I was familiar with the conditions at that time. * * * No. 3 receiving house is a brick building which has a basement below— some 12 or 14 inches below. You could call it a two-story affair. It is a basement and the top part of the receiving house where you receive oil, and the receiving house has a basement of 12 to 14 inches below—underneath where the pipes is—that is No. 3. At No. 3 receiving house at the Magnolia Petroleum Company, I don't know exactly how many pipes there are going through the basement into the first floor, but there must be somewhere between 6 and 8 lines. I think in each still there is supposed to be a line running into the receiving house, and generally from 8 to 10 stills on a battery. I can't say the number of pipes exactly. There is a number of pipes in each receiving house.

"The basement under the receiving house is where those pipes go; the oil comes from the receiving house like this (indicating). As to, how No. 3 receiving house is built, well on the east side it has no opening at all; on the north and south it has one, and on the west it has two or three; I don't know exactly. Those openings are not exactly right on the ground; you see the basement comes out 12 or 14 inches or 20 inches, and you have to step up that high to come out from under the receiving house. I would judge that the dimension of the opening is somewhere between 3½ or 4 feet. The ceiling is probably 5 or 6 feet high—hardly that. I expect it is about 5 or 6 feet. During my employment around the receiving house and with the Magnolia Petroleum Company, I have become acquainted to some extent with the working and the formation of gas in the receiving house. Of course, when the stills is coming over, it makes more or less gas. * * * I have had a couple of years' experience with gas and with the receiving houses there in the refinery. * * *

"When you go into the basement of the receiving house, you have to go in through one of those small openings at the bottom; working at the pipe part of it, you would have to go in underneath. You see there is a basement here, and about 5 or 6 feet up there is a floor; the steps go up in this part here [indicating].

"At the time of this explosion there was no other way that the basement of this receiving house was ventilated other than by those four openings. After any one has finished work down there, he would have to come out from underneath through those holes. You couldn't walk out. You would have to stoop down and come out. I don't know how far the basement

was below the surface, but about 12 or 14 inches, something like that. I don't know exactly what the distance was from the ceiling to the top of this opening, but somewhere I guess between 12 and 14 inches—that is the opening in the front.

"If a man were to enter the bottom of this receiving house through the openings in the bottom, he would have to stoop to go in there. The holes are probably 3½ or 4 feet; I don't know exactly. I know you have to always stoop down to get in them. * * *

"The basement of that receiving house consisted of pipe and different lines leading to tanks. Under the receiving house at times, of course, there would be waste oil where a leak would open or anything like that. That waste oil would generally always go to the sewers, or lots of times we put negroes in there to clean those places out when they got too bad with the waste oil. * * * I haven't had any experience in keeping down gas out of buildings or inclosures. Of course, there are several ways to do away with gas. Plenty of ventilators will do away with gas, and jets will do away with gas. By jets I mean compressed air, and by ventilators I mean if there is enough air. If there is gas in this room and you take all the windows and doors out, it will give the gas a chance to get away. Any air would do away with more or less of the gas. * * * I saw an extension cord that day that went underneath the receiving house in that basement where Mr. Robertson was working. I saw that after the explosion. It was an old cord. It had been used a great deal, and the insulation was broken on it. I have often had occasion to use extension cords in the performance of my duties. We have to use them in the stills. I know where those cords were kept. They were generally kept in the electric department. The electrical department furnishes the lights that run the plant. I don't know exactly who is the superintendent of that department. I forget who kept it and looked after it at the time of the explosion. I was just a workman on that job. When we need a cord, we always go and get it. Of course, any man is supposed to get an order; but lots of times, if you are in a hurry for a cord, you go there, and you don't pick the cord up; you have to ask a man for it, and he would give it to you.

"I didn't have access to everything that was down there. I had to ask the man who was there. They usually kept those cords in that plant. They had a special place for everything like that. Whenever I wanted a cord, I knew right where to go and get it. You had to go to the plant there and call for it. * * *

"From my experience if a receiving house is constructed in such a way that the bottom of it is open, of course, it will be beneficial, because the more air you get in there the less gas would accumulate."

E. E. Jones testified:

"I am a pipe fitter at the Magnolia Petroleum Company. * * * I was working for them about April 1, 1920, doing pipe fitting work. Mr. Robertson was my foreman. I had been working for him about six months at the time of the accident. I can't say how long I had been with the Magnolia Petroleum Company.

"I was working in No. 3 receiving house on the day of the explosion, April 1, 1920. We had been repairing lines underneath that receiving house that day. The crew consisted of Mr. Robertson's gang; we all called him Uncle Jack. We were running with the other boys that was burned underneath there. We had been working all day under this receiving house when the explosion occurred. The explosion occurred about 4:45.

"The receiving house that afternoon was very gassy, very muchly so. You could only stay under there a few minutes at a time. It hadn't been that way all day. It got gassy in the afternoon when the stills went off. I couldn't say how many pipes there are in No. 3 receiving house going out into the receiving room, but there are close around 100. The gas comes from up above down through the pipes below, and whenever you make an opening in the pipe the gas escapes through the openings you make. The gas first comes from the openings that have been made when you went under there to repair it, or if there is a leak it will accumulate. There was a leaking pipe there that day.

"As to what Mr. Robertson and the rest of the men were doing immediately before the explosion, well, we had to work by shifts in order to work under there. I couldn't say what they were doing on the outside, but we were there working tightening up a valve, and when we finished the other crew come in. One crew stayed there as long as they could stand the gas, and the other crew come in.

"The receiving house was dark that evening. I never had used what was known as an extension cord in the receiving house. There was one being used there that afternoon. I think Mr. Schultz was the one that went and got the extension cord. I didn't see it until it was shoved in to us, and they told us there was a light. I don't know where they connected that extension cord up. It was connected from the outside. The cord came in from the south door—they call it a door, but it is nothing but an opening. I never had seen the extension cord before. I hadn't used them in receiving houses before. I know where some extension cords are kept. I don't know where they are all kept. There are a few kept with the ———, and the brick masons also have a few. They have a supply house where things like that are kept.

"There are four openings in No. 3 receiving house, about four feet square each. * * *

"I was acquainted with Mr. Robertson's duties. His duties were to see that the work was carried on properly in repairing lines over the yard and any place where we went to work. He was to give orders to repair things over the yard, and it fell to our duty that day to go in this receiving house and repair the lines that were there. I was there with him when he received orders to go under the receiving house. * * *

"When you asked me what I meant by saying a while ago we were working in crews, well, there were six or seven of us, and we worked in crews in order to do this; that is, three at a time would go in and stay until we

couldn't stand it any longer; that is, gas would put us to sleep or make you drunk; we call it getting on a cheap drunk down there, and whenever you get that way you better come out, or somebody may have to drag you out. No one didn't drag me out that day, because we didn't stay in long enough; but it hadn't been many days before one was carried out. I wouldn't say it was this same receiving house.

"There were no steam jets of any kind, steam process, used in that house that day while we were working. I know steam will drive gas away for a certain length of time, but how long a time I couldn't say. I couldn't say what effect a steam jet would have had on the gas that had been accumulating there on the day of the explosion; nor could I say what effect compressed air would have had in that receiving house, because I have never seen compressed air used. I have seen steam used since then. It drove the gas away for a certain length of time. If steam was constantly used, it would be very bad for a man working under there, if you have to keep enough under there so that it would be too warm for a man to work under there, and, besides, it creates a fog. If you keep steam in there and steamed it out every once in a while, it would keep gas down I believe, to a certain extent. The gas keeps accumulating."

Cross-examination:

"Mr. Robertson had the authority from the company to direct the men how to work. On that day the duties of Mr. Robertson and our gang was to repair leaking gas lines. We repair any lines, gas, water, or fuel lines, any pipe line. Our gang was known as the pipe line gang. * * *

"We took that line apart. The gas commenced to come on about noon. That is when it began to accumulate. That isn't anything unusual in the course of the business. We and Mr. Robertson were employed for the purpose of protecting and stopping those leaks. That was his business. I had helped him before that time to stop leaks. I have been under that receiving house before with Mr. Robertson and helped him to stop leaks under it. There was always a portion of gas under there. There was gas under there before when I went there with Mr. Robertson. I knew that gas accumulated under it. He had been under there with me half a dozen times, I reckon, before that.

"I believe the openings in that receiving house are the same now as they were at that time. They are on three sides only. * * *

"Mr. Robertson knew the condition of that receiving house as to the openings before he went into it on the day of the fatal accident. He knew before that day that gas did accumulate under that receiving house. He appreciated and knew the danger of gas being under it. He was a very careful man, always observed the dangers to his men. He knew there was a certain amount of gas under that receiving house, but we never had worked under there when there was as much as there was on that day. He knew if there was any gas under the receiving house to amount to anything, and that if an electric spark or fire came in contact with it, it would blaze up. It doesn't make any difference whether there is a little gas or a great amount; the greater amount there is, the greater the fire, and vice versa.

"I think it is a fact that before this fatal accident both Mr. Robertson and all us men who worked under the receiving house knew that the business of repairing pipes under a receiving house was accompanied with great danger and hazard. I realized that fact, and he always did. He always told us boys to be careful. Every time we went under, if there was the least thing that shouldn't be under there, he said, 'Boys, take it out. It won't do. It is dangerous under here.' He was a careful and conscientious man, very much so. He was a man that always looked out for his men. I don't know that he was a little smarter than the average man. He was in some respects, but he always told us that before we went under the house. He told us that before we went under the house in this instance. He would always warn us about the danger in going under the house and the tools we carried under there. He would always tell us never to use a hammer or never to hit any pipe, because it would make a spark and set the gas on fire. He didn't say anything about an extension cord or about using electricity under there. I hadn't used an extension cord in any of my work with him before that time. We never had been that far back under the house to use any light. That was on the back side. Consequently, it was more dark back there because you would have more lines in your way to knock off your light, what little you got. * * * It is darker under there all the way, but it is darker in the back, and the pipes knock most of the ventilation off. It is darker further off towards the pipes were that we were working on. We worked in there from about 9 to 12 without any light. We took out during that time and started putting it back. When we started putting it back, the gas commenced to accumulate. That gas was coming out of the lines. That is what we were expecting. Mr. Robertson told us there was going to be gas in there. He told us, 'The gas is going to be hell in here directly,' and he said, 'Hurry up!' We worked in shifts. The boys began to say, 'We can't stand it any longer.' Then three of us would go in there and work until we commenced to feel it, and then three men would come and take our places. While they were working, we were getting our lungs cleaned out on the outside.

"The light was furnished to us when we started in under there with a piece of pipe. I don't know who called for that light, but some of them said, 'A light would go mighty good under here, and it would keep our fingers from getting caught,' and we had to have a light in order to tighten the bolts as well. That light was brought there some time between 11 and 1; I couldn't say exactly when. The explosion took place about 4:45 that evening. The light had been there I knew between 11 and 12, and the explosion took place at 4:45, but we hadn't been using the light under there all that time. We had been out part of the time making up several fittings in order to fit into those. We made up those pipes so that we could have time to get them in before 5 o'clock. We wanted to get them all in that night. * * *

"In order to get under the receiving house to make repairs, men would go into those port holes and come out that way, taking into consideration the gas which accumulated under the house when the men were under it to do repairs to those leaky pipes and the size of the building and the areas under the first floor or the basement area; I don't think that the openings under that house were sufficient to provide an outlet for the gas that had accumulated there. * * * We stayed under that house about as long as we could before being overcome by gas. We stayed about 20 minutes. Those openings did not form a sufficient outlet on that day for the gas to escape. I don't think that receiving house was equipped with steam lines at that time or a compressed air line. I never had seen one in there or used one from that time.

"To have used steam or compressed air under there, it would not have been necessary to install any machine at all in the house. They have got machines there, and all they would have had to do would have been to run a line down. It would not have had to run except up to the opening, and the more steam there is coming the less gas accumulates. The steam is on the stills, and also the air is on the stills that the boiler makers use, and the steam is used for the stills."

### Mr. Spoonamore testified:

"I am pipe fitting for the Magnolia, Gladys Station. I have been with them for different intervals. I have worked about 14 or 15 years for the Magnolia. * * * I am familiar with the photograph there of the building that photograph represents. As to how that No. 3 receiving house is constructed under the bottom of the basement, well, there is an opening in this end, and there is an opening in this end. There are five or six sets of lines that run through into the back of this receiving house. They come down from out of the top of the receiving house and are used in what we call a trap in the receiving house—that is, merely a case for the oil—and then it comes through into the line here, and then the lines are cased off, and it goes into the receiving portion. If you want to enter the basement, you have either to go in here in this opening or this one or at the end opening. Those openings are for the men to pass in and out to do their work, and for air vents, I suppose. * * *

"As to whether there could be an accumulation of gas in a place where there is plenty of air and it properly ventilated, well, it would be owing to circumstances in that case, too. It would be according to the current of air that we had. I should think that air would have something to do with causing air to be dispensed with in the building. I suppose gas could accumulate under No. 3 receiving house if the bottom were open. When you ask me if the accumulation of gas could be as great when the bottom of the structure was open and it could receive plenty of ventilation, well, I haven't seen anything like that outside, and I wouldn't say for sure on that proposition. * * *

"During the time I worked in the receiving house for the Magnolia Petroleum Company, it has been customary to use what has been known as extension cords. We invariably use them. We use them to give us more light. If you are working in the back side of a building lots of times you want them. It is pretty dark in the back of No. 3 receiving house. * * *

"When I had occasion to go in the receiving house and do work there, the first proposition when I would go under a receiving house I wouldn't allow any man to take a hammer in there, because I knew it was a dangerous proposition for a man to be hammering under a receiving house, that is because gas was under there, and there is always some fool that will pick up a hammer and rap on a tee, and there would be a spark and it would cause an explosion. If I took an extension cord under there, I always examined the extension cord to see that the insulation was not broken. I generally went to the turbine building for my extension cords. That was the place where they were kept. There was a man there that done nothing but repair extension cords. When I went after an extension cord myself—I don't know what another man would do—but when I went after one myself, I would generally always look at the extension cord before I taken it out, and if it wasn't in good shape I wouldn't receive it."

### Jules Monceaux testified:

"I was working with Mr. Robertson at the Magnolia Petroleum Company. I was with him on the day of the explosion at the Magnolia Refinery. When we first started to work we was tearing down a leaking line in the receiving house. We went to work about 9 o'clock that morning. We had been tearing down a line that was leaking, and they had some oil in a hole down there, and we called it gas oil. In the beginning, at 9 o'clock, when we were unscrewing that leaking pipe under the receiving house, there was some oil in the basement. It is a hole like on the northern side of the receiving house in the ground about that deep [indicating]. I mean there was a little pit. There was some oil in it. There wasn't so much gas in it at that time, but there was a little. I continued to work there all that morning and around about 11 o'clock or 11:30 it got so dark in there, and the gas was accumulated in there, that somebody brought an electric light. We couldn't see what we was doing, so they brought a light with an extension wire so we could see what we was doing. I don't know who called for the light. That is out of my knowing, but the first time I saw the light was around 11:30. I didn't hear any one call for the light, when the light first came. It was on our right-hand side where we was working, hanging on a pipe with an extension cord. We were working with Mr. Robertson on the pipe when this light was brought. When the light was brought in, Mr. Robertson kept on working. As to whether I continued to work on all the time, oh, we couldn't work but 20 minutes at a time, because the gas was so strong we had to go out and take a blow about every 20 minutes. He cut our gang in two, and we would be part in and the other part out.

"I was with Mr. Robertson when the explosion took place. Mr. Robertson was fixing to get through on a nipple, 6x8 nipple, and he

.told Thomas, one of our friends that got killed, he said, 'Son bring the light out here,' and just as soon as Mr. Thomas got the light he dragged it from the pipe, and everything blowed up. just like a lightning spark. When Robertson called for the light, Thomas took the light and dragged the cord against the pipe and then it blew up. I saw the sparks just like lightning. I spur a spark, and everything caught on fire. Just as soon as Mr. Robertson told Thomas to bring the light to him, so that he could see to do his work, I looked at Thomas when he caught the light, and just as soon as he took it the spark came out and everything blowed up. That is the last I know of."

### J. F. Choate testified:

"I work in the pipe department of the Magnolia Petroleum Company. I have been working with that company since May, 1916, and am now employed by them. I knew J. M. Robertson, and was acquainted with him at the plant. I never worked particularly in his gang, but he worked down there with us a day or two. There was just one gang doing repairing work, and my foreman was off, and he came down there to take my foreman's place. My foreman's name was Frank Robertson. He and J. M. Robertson were not related.

"On the day of the explosion in No. 3 receiving house, Mr. J. M. Robertson had taken the place of my foreman in that way; I was working with him that day. I was working on No. 6 and 7 batteries. I wasn't working in one of the receiving houses. I worked with him until that evening. That morning he put me making gasoline for still No. 56 and between 12 and 1 o'clock he called on me for more help. I was working under No. 3 receiving house when he called on me. He just asked me to help him. He wanted to get through under there, and he claimed he would not have got on without us three. There was three men, and that gave him help. I mean it was a hurry-up job he was doing. It was an emergency job. The pipes were leaking down there, and that caused an emergency. He called on us for additional help in order to get through before 5 o'clock. There was three of us boys from our gang went to the assistance of Mr. Robertson's crew. We were just three workmen. I and the other men got under the receiving house.

"When I got under there Mr. Robertson told me to get a hook and screw that pipe on and work along. He would tell us what to do. I could do that work under there. Mr. Robertson sent me out from under the receiving office one time to the office for the time book. Before I went under the house, he sent me for an extension cord. That was before I went under the house. I suppose he wanted that extension cord because he wanted a. light. Mr. Robertson, who was killed in the explosion, sent me out for the extension cord, and I went out and got it. As to where I went .for it, I went in the regular place where they kept part of them. They are in the bricklayer's department—the bathhouse—they had a box to put them in, and there is where I got them. I didn't make any inspection of the cord. I presented it to Mr. Robertson, and we connected it up, and he put the light under the house himself. When I handed it to him, he wasn't under the receiving house. He was on the outside. He didn't make any inspection of the cord. * * *

"When I got there, they were putting in new pipe, taking out old pipe and putting in new pipe under the receiving house. I went under the receiving house and started to work. Mr. Robertson was under there at the time with me. The work we were doing then required a light. When you ask me to isn't it a fact while I was under the house someone said they needed a light, and I said, 'I know where I can get one,' and he said, 'Well, go and get it right away,' and I went and got the cord, the cord was in the bricklayer's bathhouse in a regular box—tool box—that they kept them in. I suppose that was about 200 or 300 feet from the receiving house. The bricklayers use those cords about their work. * * *

"I didn't go for an extension cord to be used before under a receiving house. No one told me where to get that extension cord. I got it because I knew where it was. No official or any other employé of the Magnolia Petroleum Company gave me that cord. No employé, officer or servant of the Magnolia Petroleum Company gave me that extension cord. I went there and got it myself and gave it to Mr. Robertson. He took it and used it. There was nothing to keep him from seeing the condition of the cord after I gave it to him. It was daylight.

"I don't know where the electrical shop is. I don't know where the turbine building is. I may know it, that is, I may have seen it, and didn't know what it was. I don't know it to be a fact that extension cords and flash lights and implements of that character are kept in the electrical building or turbine building to be issued to employés as they want them. I never did get one before. I don't know anything about that. * * *

"The bricklayers usually kept their cords in that box. That extension cord .was in the bathhouse in a tool box. They kept their tool box in the bathhouse in a dressing room where they kept those cords. For that reason I went over there and got it. The bricklayers work in a different department from the pipe line department. They use the cords working on the brick and fixing up things of that sort, either inside or outside work. I don't know whether they work under receiving houses or not. I know they use cords underneath boilers."

The above is practically all of the evidence bearing upon the question of negligence.

[2] Appellants insist that the manner of constructing the receiving house—not preparing sufficient openings for the escape of gas, and not providing for the application of steam jets or of compressed air for the dissipation of leaking gas—amounted to gross negligence on the part of appellee. Does the evidence show an entire want of care in the manner in which the receiving house was built and maintained, which would raise a presumption of a conscious indifference to consequences? The record

shows that there were four openings, each about four feet square, in the receiving house, put there for the purpose of relieving the first floor of gas that accumulated thereunder, and it is not shown that any other accident of a similar nature had occurred in same. But, if it should be conceded that the receiving house was negligently constructed or not constructed along the lines of modern arrangement for safety, still, does the evidence show that entire want of care for the safety of the employés who would be compelled to work therein that would warrant the belief that the negligence was the result of a conscious indifference to the rights, safety, and welfare of the employés; in other words, does the evidence raise the question of whether, at the time the receiving house in question was being erected, appellee consciously caused same to be so constructed as to endanger the lives of the operatives who would have to perform services thereunder? We · do not think so, but appellants contend that appellee is guilty of gross negligence, because it did not use steam or air to drive out the accumulated gas. Deceased was foreman in charge of the work, experienced in such work, and knew its dangers. If he had thought it necessary to use steam or air for that purpose, he had ample authority to do so. The record does not disclose that he thought it necessary to use either steam or air, and, if he was not impressed with the necessity for their use, how can it be said that appellee is guilty of gross negligence in not doing so?

[3] But appellants further insist that, considering the dangerous nature of the work that deceased was doing, and the fact that appellee had not provided any means to prevent the accumulation of gas, nor taken any steps to remedy what they contend were the defects in the construction of the building, the furnishing of a defective extension electric light cord to be used for lighting purposes under such circumstances constituted gross negligence.

It appears from the record that in doing repair work under the receiving house, where a light was needed, it was customary to use extension electric light cords, and that such cords were specially provided for that purpose; that they were kept in what was called the turbine building; and that there was a man employed for the sole purpose of keeping said cords in repair, and that when an extension cord was wanted for the purpose of lighting under the receiving house when making repairs there, they went to this turbine house and secured the cord. The extension cord used at the time of the explosion was obtained, at the request of deceased, by an employé who, it appears, did not work regularly in the repair work, but who on this day was working under deceased, from what he called the "bricklayers' department," out of a box. He testified:

"Mr. Robertson said they needed a light, and I said, 'I know where I can get one;' and he said, 'Well, go and get it right away;' and I went and got the cord. The cord was in the bricklayers' bathhouse in a regular box—tool box—that they kept them in. I suppose that was about 200 or 300 feet from the receiving house. The bricklayers used these cords about their work."

The witness said that he got the cord and gave it to deceased, and that he and deceased attached it to the socket on the outside, and used it for lighting; that neither he nor deceased made any inspection of the cord before using it. So it appears that the cord was not furnished by any officer or any one in authority connected with appellee, and that said cord was not obtained at the place where cords used for lighting under the receiving house were kept, nor from the person whose duty it was to keep and repair them for that special use, but, on the contrary was gotten from a tool box in the bricklayers' department, and that same was a cord used by the bricklayers in their work. The cord, though worn, was entirely safe for use in the department where it had been used, the bricklayers' department, but evidently was not intended to be used in the pipe line and repair department, and was not furnished for such use by any one whose duty it was to supply same.

[4, 5] Appellants urge that the question of whether gross negligence is shown and of whether exemplary damages should be allowed is one for the jury, and hence that the court erred in directing the verdict. The statement of the rule is correct, but in order for the rule to apply there must be evidence raising the issue, or there is nothing to submit to the jury. Whether there is any evidence raising an issue is a question for the court. It is well settled that when the evidence is not sufficient in law to authorize a finding for the plaintiff by the jury, the court is not required to go further with the trial, but in such case the jury should be peremptorily instructed to find for the defendant. Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059; Radley v. Knepfly, 104 Tex. 135, 135 S. W. 111.

A careful consideration of the evidence convinces us that gross negligence as defined by our Supreme Court in Railway Co. v. Shuford and Cotton Press v. Bradley, supra, is not shown. We do not believe that the evidence raised the issue of gross negligence, and therefore the court did not err in directing the verdict.

There are other questions presented and urged by appellee, but in view of the above holding, a discussion of them is not necessary.

The judgment is affirmed.