## TRACEY v. WICHITA ICE CO.
### No. 12350.

Court of Civil Appeals of Texas. Fort Worth.
June 14, 1930.

McRae & Dale, of Bonham, for plaintiff in error.

Bullington, Boone, Humphrey & King, of Wichita Falls, for defendant in error.

BUCK, J.

In this case Mrs. Elizabeth Tracey sued the Wichita Ice Company for exemplary damages arising out of the death of her husband, C. H. Tracey, on June 14, 1928, due, as alleged, to the gross negligence of the chief engineer of the defendant company. It was alleged that Tracey was engaged in the occupation of pulling ice from the zinc containers, and was directed and commanded by the chief engineer to stop a gas leak; that the boiler sought to be repaired was not in operation on the night of the injury, but the same had sprung a leak in the gas lines or tubes, and it had been shut down for that reason. That said engineer knew that said Tracey was not familiar with the manner of repairing said boiler, and that he did not know that it was dangerous to go into said box, and that said engineer, deliberately and in utter disregard of the lives and safety of the workmen, ordered Tracey to go in said boiler and repair said gas leak, and, acting under the advice of the engineer and under his direction, and not knowing the danger that said piece of work entailed, said Tracey undertook to obey the orders of said officer and went into said boiler, and, while attempting to repair the leak, an explosion occurred, blowing the said deceased's body against the boiler and causing him such severe injuries that he died on June 14, 1928, by reason of said injuries.

The defendant answered by a general demurrer and a general denial, and further pleaded that the plaintiff filed a claim before the Industrial Accident Board of the State of Texas for compensation for the death of her husband, and that it awarded to her the sum of $3,083.49, and that the same was to be in full and final settlement of all claims growing out of the common law or Workmen's Compensation Act or the Employers' Liability Act. Mrs. Tracey acknowledged in her testimony that she had received a check for $3,083.49, under the award paid by the Industrial Accident Board.

After the testimony had been submitted, the court instructed the jury to return a verdict for the defendant, and, upon the verdict so returned, the court entered judgment for the defendant. The plaintiff has appealed to this court.

### Opinion.

The suit in this case is under article 8306, § 5, Rev. Civ. Statutes, which in effect provides that nothing in this law shall be held to prohibit exemplary damages by the surviving husband, wife, heirs of his or her body, in a suit for such exemplary damages as distinguished from actual damages.

Plaintiff introduced Charles L. Runyon who testified that he was night engineer for the corporation commonly known as the Wichita Ice Company, though such was not its proper name, as its name had been changed to the Southern Properties, Incorporated, in 1926 and prior to the death of said Tracey. He testified that he was acquainted with

Tracey and had known him since about the middle of November, 1927; that he had worked in the plant under his direction and under the direction of others since October, 1927. That he was an ice puller; that he could not recall the exact time he had been an ice puller prior to June 3, 1928, but would say possibly 30 days; that previous to the time he was an ice puller he was a repair man, doing general repair work on anything that needed repair. That at times he was a helper under others and the witness, and at times those in charge found a job for him to take the lead in; that by helper witness meant he gave him special instructions to do a certain job; that at all times that he was a repair man he did his work under special instructions from other engineers or the witness; that he repaired boilers, which consisted of rolling tubes, helping pipe them up, and steam fitting. That at times the tubes in the boiler got to leaking and they had to be repaired, and when witness used Tracey as a helper he did this kind of work under direction of witness. That witness used him as a helper in repairing boilers at times, and at times he was under the directions of some one else. That witness would not attempt to leave him with a repair job on a boiler and go off and not give him instructions as to what was wanted done. That on the night of June 3, 1928, there were two boilers in operation, though there were three boilers used in the operation of the plant. On this night one of the boilers was out of repair and leaked, and he ordered Tracey to work on this boiler and roll the tubes and stop the leak; that when he told Tracey to do this work, Tracey answered, "All right." That the smokestack to this boiler had blown down that day and cut a hole in the top of the building; that there is quite a lot of gas that escapes through the smokestack that is not used in combustion, but, if it has a proper combustion, all the gas is used; that he did not examine the connections to this boiler previous to the time he told Tracey to go into the furnace that night; that to the best of his recollection it was around 10 o'clock or maybe a little later or a little earlier that Tracey started to do this repair work; that Tracey used an extension cord that night in testing and attending to the boilers. That witness did not examine that cord before Tracey used it that night; that he did not remember what kind of a bulb was on that cord, but a 50-watt bulb was generally used, just a common light bulb; that there were no guards around this bulb that night when it was in use, and he did not know whether the extension cord had a "short" in it or not; that it would be dangerous to enter a furnace or boiler that might have gas in them with an extension cord that had a "short" in it; that it might be dangerous to enter a boiler or furnace with an electric light that had no guards on the bulb, although he never considered it in that way; that he just took chances. That on June 3, 1928, he ordered Tracey to enter the rear part of the boiler in question; that he was not in the boiler room at the time of the accident but heard a kind of rumbling noise, but did not pay any attention to it, but thought it was thunder and lightning; that he did not know what caused the injury to Tracey; that when he got to Tracey, Tracey told him he was struck by lightning; that he was just outside of the boiler room door in the engine room when he told witness that he was struck by lightning; that witness examined the gas lines leading from the boiler in question and could not tell that any of them were cracked so as to allow gas to get into this boiler; that Tracey had rolled flues in the boilers at the plant two or three different times; that he had no idea there was any gas in that boiler at the time he told Tracey to go into it and repair it. That he did not believe there was any gas in that boiler; that he had not detected any gas in it; that Tracey did not say there was any gas in that boiler; that the only thing he told witness was that he was struck by lightning.

Cecil Rhodes testified that he was 19 years old and that he had known C. H. Tracey about a month and a half before he died; that he had worked with him; that at that particular time he was a fireman, that is, he was firing the boilers; that Tracey's duty at that time was pulling ice; that witness received orders at the plant that night to help Tracey roll the flues in No. 2 boiler; that the flues were leaking in that boiler, they were leaking water. That he had not rolled tubes or flues in boilers before that time; that Tracey had done that kind of work before; that he had seen him do it; that to the best of his recollection it had been 24 to 48 hours since they had used boiler No. 2; that before a boiler can be repaired the fire is turned off and it is given time to cool off. That the first thing they did was to put up an extension cord or light wire, so they could have light inside the boiler; that he was in front of Tracey and went into the boiler first; that the extension cord came apart—they had two of them together; that neither of them was handling the light wire; that the light wire was already in there; that when the extension cord came apart he got out and put the parts together; that he had to go back about four feet from the opening of the boiler to put the wires together; that Tracey was inside the boiler, that is, inside the furnace; that when he put the extension cords together, he turned around and started to go inside the boiler and there was an explosion in the furnace—there was just a puff of fire came out, and witness jumped back, it blinding him for a second,

and, when he got to where he could see again, Tracey was lying outside the boiler; that Tracey was inside the furnace facing the front the last time he saw him, and after this puff and explosion he was on the outside; that he could feel some heat after the explosion; that Tracey was burned, his breast burned, his face and hair; that the first thing Tracey said to him was "put me out," meaning put the fire out burning his clothes; that he did so. That he went in to the boiler first and did not smell any gas; that his sense of smell is good; that he was in the boiler about a minute; that he and Tracey were both in the boiler at the same time; that they used two extension cords connected together, one just slips into the other one and they came apart, or pulled apart; that the wires in the extension cord were not bent or open that he knew of; that they just pulled apart at the two sockets where they slip together; that he would not tell the jury that the lightning did strike Tracey or that there was no gas in the boiler, yet, as far as he could tell, there was no gas in it; that as far as he could tell there was nothing outside of the lightning that could have hurt Tracey; that there was no rain at the time of the accident, but it had been thundering and lightning before that time; that he did not remember whether he heard any loud clap of thunder about the time Tracey was hurt or not; that he did not see any signs around there where lightning had struck; that he saw no signs of lightning having struck the building.

Dr. B. C. Camack testified that he was a practicing physician and treated Tracey from June 3, 1928, to June 14th, when he died. That the burns on Tracey's body, in his opinion, were caused from a burning flame of some kind; that he had never seen a man that was struck by lightning since he was a small boy, and had never had any experience in the treatment of one struck by lightning; that in his opinion, formed by reading and study, Tracey suffered from injuries caused by a flame and not from lightning.

This is practically all of the evidence pertaining to the facts of this accident. It seems to us that there was no evidence even tending to show gross negligence. Gross negligence is defined in M. P. Ry. Co. v. Shuford, 72 Tex. 165, 10 S. W. 408, 411, as follows:

"Gross Negligence, to be the ground for exemplary damages, should be that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it."

In I. & G. N. Ry. Co. v. Cocke, 64 Tex. 151, it is said: "Negligence cannot be considered 'gross' unless evidenced by an entire failure to exercise care, or by the exercise of so slight a degree of care as to justify the belief that the person on whom care was incumbent was indifferent to the interest and welfare of others."

The evidence shows that Tracey had been working at the ice plant for something over a year and had used and repaired boilers for some time, although he had been working as an ice puller for some 30 days before the accident. While Runyon says that he would not have relied on Tracey to perform a boiler repair job unless he was in the plant to direct him, yet it appears that he was in the plant at the time of the accident, and that only preliminary matters had been performed, such as fixing the light, before the explosion. There is no testimony that gas had collected in the boiler room or that the light cord was defective, or that by the use of the light bulb without guards the injury resulted, although it may be reasonably inferred that gas was in the boiler at the time of the accident.

The case of Robertson v. Magnolia Petroleum Co. (Tex. Civ. App.) 255 S. W. 223, 230, writ of error dismissed by the Supreme Court for want of jurisdiction, presents facts similar to those in the instant case. The wife, suing for alleged gross negligence causing the death of her husband, and asking for exemplary damages, alleged that the Petroleum company had ordered her husband to repair certain leaking pipes in a building owned by the company. It was shown in this case that the place where the work was done was located in the basement of the building where there was a cesspool in which oil from leaking pipes had collected, and being of a highly inflammable and explosive nature. Robertson, with other employees, was sent by the petroleum company to repair a leaking gas pipe, and the evidence showed that gas had collected there in such a manner that it was impossible for the employees to work in the place but for a moment or two at a time. In doing this work, the deceased had obtained a light and an extension cord, in which there was a short or defect, and, by virtue of this defect in the cord, the gas in the basement of the building was ignited and the deceased was killed. The evidence further showed that the cord had been obtained by one of the workmen. The Beaumont Court of Civil Appeals said:

"Appellants urge that the question of whether gross negligence is shown and of whether exemplary damages should be allowed is one for the jury, and hence that the court erred in directing the verdict. The statement of the rule is correct, but in order for the rule to apply there must be evidence raising the issue, or there is nothing to submit to the jury. Whether there is any evidence raising an issue is a question for the court. It is well settled that when the evidence is not sufficient in law to authorize a finding for the plaintiff by the jury, the court

is not required to go further with the trial, but in such case the jury should be peremptorily instructed to find for the defendant. Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059; Radley v. Knepfly, 104 Tex. 135, 135 S. W. 111.

"A careful consideration of the evidence convinces us that gross negligence as defined by our Supreme Court in Railway Co. v. Shuford and Cotton Press v. Bradley [52 Tex. 587], supra, is not shown. We do not believe that the evidence raised the issue of gross negligence, and therefore the court did not err in directing the verdict."

In Magnolia Petroleum Co. v. Ford, 14 S.W.(2d) 97, the Eastland Court of Civil Appeals held that gross negligence was not shown, and reversed and rendered the judgment of the trial court.

H. & T. C. Ry. Co. v. Cowser, 57 Tex. 293, Samples v. W. R. Pickering Lumber Co. (Tex. Civ. App.) 291 S. W. 254, 255, and other cases, seem to hold that a corporation is not liable for gross negligence, unless the act complained of was committed by one representing the corporation in its corporate capacity as a corporate officer and not merely as an ordinary servant or agent. But in Chronister Lumber Co. v. Williams, 116 Tex. 207, 288 S. W. 402, by the Commission of Appeals, it was held that gross negligence may be established by proof that the negligent act was done by or under the authority of one who had complete control of the employees engaged in a particular work. However, we do not think that the responsibility of the corporation in this instance, for alleged gross negligence of its assistant engineer, is material, as the facts do not show gross negligence at all.

The judgment of the trial court is affirmed.