### SOUTHWESTERN SEWER CO. v. CROSS et al.

No. 8184.

Court of Civil Appeals of Texas. Austin.

March 18, 1936.

Rehearing Denied April 15, 1936.

Turner, Seaberry & Springer, of Eastland, Lightfoot & Robertson, and Nelson Scurlock, all of Fort Worth, for appellant.

Frank C. Dickey and Paul Petty, both of Ballinger, and Critz & Woodward, of Coleman, for appellees.

BLAIR, Justice.

This suit filed by appellee Mrs. Thurman C. Cross, for herself and as surviving widow and as next friend of their minor child, Billy Jean Cross, is for exemplary damages only for the death of Thurman C. Cross, which was caused by the walls of a ditch or shaft he was digging caving in and falling on him while he was working as an employee of appellant, Southwestern Sewer Company, a corporation, in connection with the repair by appellant of a sewage disposal plant for the town of Ballinger. Appellees alleged that actual damages accruing to them in the premises were covered by workmen's compensation insurance, which insurance was being paid them; but that they were entitled to recover additionally exemplary damages, because appellant was guilty of gross negligence in failing to furnish the deceased with a reasonably safe place to work, in that the walls of the ditch or shaft were loose dirt, insecure, and easily susceptible of caving, all of which was known to appellant, or could have been known by the exercise of any care whatever; but that, notwithstanding such condition, appellant instructed and required the deceased to dig at the base of the walls of the ditch or shaft without taking any precaution to brace the walls; and that appellant was guilty of gross negligence in failing to properly brace the walls of the ditch or shaft, and in failing to provide proper safeguards against the caving of the walls by bracing same; and that appellant was guilty of gross negligence in the manner of constructing the walls of timbers across a part of the ditch or shaft; and that as the result of such gross negligence the walls caved in and fell on and killed deceased.

In answer appellant pleaded assumed risk and various acts of alleged contributory negligence on the part of deceased. The jury answered all special issues, except No. 21, favorably to appellees, and awarded $2,100 as exemplary damages, $100 to the surviving widow, and $2,000 to the minor child; and judgment was accordingly rendered for appellees.

The work of repairing the sewage disposal plant by appellant corporation was done under the direction of its foreman or superintendent of construction, D. E. Weeks, who managed, controlled, and directed every detail of the work, employed and discharged all laborers; no other officer or agent of appellant corporation having anything to do with the work. As such foreman or superintendent, to whom the corporation intrusted the complete management, control, and direction of the repair work, Weeks became the "vice principal" or "alter ego" of the corporation in the sense that it would be liable for his gross negligence in failing to perform for the corporation its nondelegable duty of furnishing the laborers with as reasonably safe place to work as the facts and law applicable required. Fort Worth Elevators Co. v. Russell, 123 Tex. 128, 70 S.W.(2d) 397.

The jury found in answer to special issues that appellant "was grossly negligent in not providing proper safeguards in the way of braces in the excavation where deceased was working," and that "such gross negligence was the proximate cause of the death of deceased"; that appellant "was grossly negligent in the matter of constructing the wall of timbers across the excavation and in piling dirt against the west side of same;" but no issue was submitted as to whether this alleged act of gross negligence was the proximate cause of the death of deceased. The jury found in answer to special issue No. 21 that Weeks did not know "prior to the time of the accident that the walls of the shaft * * * were insecure and calculated to cave;" and in answer to special issue No. 22, that "Weeks, by the use of any care at all, could have anticipated that the wall of dirt that caved in on deceased would have so caved in on him."

We have reached the conclusion that there is no evidence from which it can be reasonably inferred that appellant was guilty of gross negligence in the particulars alleged and found by the jury, and particularly is this true in view of the fact that the jury found, in answer to special issue No. 21, that Weeks did not know "prior to the time of the accident that the walls of the shaft were insecure and calculated to cave."

The rules of law applicable and the character of evidence required to establish the liability of a corporation for exemplary damages arising from gross negligence have been carefully restated and defined by the Supreme Court in the recent cases of Fort Worth Elevators Co. v. Russell, supra, and Texas Pacific Coal & Oil Co. v. Robertson, 79 S.W.(2d) 830, 831, 98 A.L.R. 262 from which case we quote at length, as follows:

"The definition of gross negligence which has probably been quoted oftener than any other by the courts of this state is that given by Judge Stayton in Missouri Pacific Ry. Co. v. Shuford, 72 Tex. 165, 10 S.W. 408, 411, and is as follows: 'Gross negligence, to be the ground for exemplary damages, should be that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the rights or welfare of the person or persons to be affected by it.' * * *

"It is to be observed that the definition quoted uses the words 'conscious indifference,' thus stressing the mental attitude of the person charged to have been grossly negligent. Gross negligence is positive or affirmative, rather than merely passive or negative as ordinary negligence often, and perhaps usually, is. As said in the discussion in Ruling Case Law of the right to recover exemplary damages for gross negligence: 'The rule is that recovery is permitted, in, and confined to, cases where the negligence is wilful, or where it is so gross as to indicate wantonness or malice.' 8 R. C.L., p. 590. Mere indifference is not enough. The indifference must be conscious. The indifference is to the rights or welfare of the person or persons who may be affected by the act or omission. Thus the doctrine of foreseeableness becomes important. * * *

"The person charged with the act or omission cannot be consciously indifferent to the rights or welfare of another unless he knows, or should know, that such another will probably be affected by the act or omission."

The undisputed facts showed that the disposal tank under repair was made of concrete and was approximately 10 feet wide, 10 feet deep, and 103 feet long. A part of the concrete top had fallen in, necessitating the repair work. There was a "by-pass" line which was used to divert the sewage from the tank when work was required to be done on it. This line was stopped up so that it was necessary to excavate and open the line. It was also necessary to excavate for the purpose of locating the valve on the main line leading to the tank itself. When this excavation work was completed, it was the shape of the letter "T," with the top part or cross of the "T" running north and south and the stem or upright bar of the "T" running east and west. The following map will show the situation:

The top part of the "T" was first excavated in order to open the by-pass line, which line is represented on the map by the line marked with the figure "1." This excavation was 4 feet wide, 8 feet long, and approximately 10 feet deep. As is shown on the map, the west wall of the concrete tank was the east wall of this excavation for a distance of 2 feet, but it extended beyond the south end of the tank 6 feet. When the excavation represented by the top of the "T" was completed, then the excavation was continued for the purpose of locating the valve on the main line and other purposes, and this part of the excavation formed the stem or upright bar of the "T." It was 4 feet wide, 6½ feet long, and was adjacent to the south wall of the concrete tank, which wall formed the north wall of this excavation. The stem part of the "T" was excavated in two sections at different times, the west half being first excavated to the depth of about 12 feet immediately after the portion forming the cross of the "T" was excavated, and whatever was necessary to be done in this excavation was completed. The entire original excavation was therefore the top part of the "T" and this adjacent west end of the stem portion of the "T," and is shown on the map by the arrowhead line. Then a wall of timbers was constructed between the part of the hole which formed the top of the "T" and that part of the hole which then formed the stem of the "T." This wall consisted of cross timbers at the bottom and near the top of the excavation, the north end of the top cross timber resting on or against the corner of the concrete tank and its south end on the dirt wall, and is represented by the line marked with the figure "2." Vertical boards were nailed to these cross timbers, thus forming the timber wall. Neither of the outer walls of the original excavation was ever boarded, and these walls stood open for several weeks. The part of the original excavation which formed the top of the "T" was refilled after the construction of the timber wall so that it was at a depth of approximately 4 feet; the loose dirt being piled against the west side of it.

The deceased helped construct at least a part of the timber wall shortly before he went to work on Thursday afternoon, which was the first time he had been employed in connection with the excavation work. Weeks assigned him to digging the east half of the excavation which formed the east end of the stem of the "T." He was instructed by Weeks to dig this portion of the excavation straight down and to shovel the loose dirt into the other portion of the excavation between the place he was digging and the timber wall; and at the time of the accident, about 3:30 the next afternoon (Friday), he had dug the east portion of the stem of the "T" down to a depth of about 4 feet, and had refilled the other part of the stem of the "T," so that it was at a depth of between 6 and 8 feet. The dividing line between the portion of the excavation he was digging and the portion he was filling up is shown on the map by the line marked with the figure "3." Weeks left the deceased digging at the point marked "4," in the east end of the excavation, a "minute or two" before the accident. No one saw the accident. Another employee working in the tank near by heard deceased "cry out," and, looking up, saw that the wall had caved in on him. He gave the alarm, and immediately he, Weeks, and all other employees rushed to the place where deceased was buried with dirt, except his head and his left hand, which was extended above his head. Deceased was in a standing position, and the dirt had filled the excavation all around him. He was at the extreme southwest corner of the portion of the excavation he was engaged in filling up, and at the point marked "X" on the map. The wall that caved off was a portion of the south wall of the excavation he was filling up. It caved off from about the line of intersection of the east line of the top of the "T" with the south line of the stem of the "T," and extended eastward for 3 or 4 feet and downward for about 5 feet, and occurring at the point marked "5" on the map. Deceased was struck on the left side of the head and his left ear was partly torn off, and his neck was broken. Several witnesses testified that a large clod, estimated as weighing about 100 pounds, was near or against deceased. He died instantly as the result of his neck being broken.

Weeks testified in detail about the excavation work, from the beginning to the time of the accident. He had been engaged in excavation work for about 15 years. As to the character of the soil, he testified that the material which caved in was not "loose material that had been dug"; but "was the natural formation of the soil"; that it had to be picked all the way down; and that soil which is hard enough to be picked is not likely to cave. He further testified as follows:

"Q. What was the nature of the top of the dirt when you first started the excavation down there? A. It was awfully hard. I was very much surprised when I saw the conditions down there because river soil is expected to be more or less soft and easy to get into, but we had to pick the soil from the top of the ground on down.

"Q. Did you find any sand pockets as you went down? A. No, sir. * * *

"Q. And with your experience as a construction engineer it didn't raise any suspicion in your mind of the probability or the possibility of such a thing happening? A. I didn't think that it would cave.

"Q. Then you can't give the jury any reason why it caved at that particular time that it did? A. No, sir, I don't know of any reason that it caved; of course, it was deeper and it had to be picked all the way down. * * *

"Q. Now, tell the jury why that end fell in like it did, so suddenly and so full of it? A. I really don't know why it fell in.

"Q. From your expert experience as a construction man—your experience doesn't carry you that far, does it? A. Sometimes things fall and you don't think they will, and you can't tell why; it is just one of those things that happen.

"Q. From your experience as a construction man in that character of work, you don't get any information as to why that dirt fell in? A. No, sir, that doesn't tell me why it fell in.

"Q. Then you haven't gotten that far along in this business? A. No."

The laborers who did the excavation work testified that the soil was hard, and that it had to be picked all the way down. Each of these witnesses testified that at no time did they see any cracks or defects in the wall which caved. Neither of them ever made any protest to Weeks that the excavation walls were dangerous, and each testified that he did not regard the excavation as a dangerous place to work.

Weeks further testified as follows:

"Q. How often did you examine the walls of those excavations? A. When I had anybody in there I was down in there and in and out. If I had men in there I was in there every few minutes looking at the walls.

"Q. That day prior to the accident, did you observe any cracks or defects in the walls of that excavation? A. No, sir.

"Q. How long was it before the accident that you saw Mr. Cross alive? A. It must not have been more than two minutes.

"Q. Where was he then with reference to the place where you finally found his body? A. Well, where I left him working, it was at least five feet east of where he was found.

"Q. Did you give him any instructions with reference to where he should work? A. Yes, sir, I told him to work and put him at one place and told him to carry that straight down; told him to throw the dirt over into the deep hole; and stay at that place, and stay out of the other hole because we were through with it.

"Q. Was there any other work of any kind to be done where he was killed? A. No, sir.

"Q. And instead of being working there, you were filling it up? A. Yes, sir, we were through with it. * * *

"Q. If Cross had stayed where you put him, and told him to work, would he have been injured by this cave? A. No, sir, the dirt wouldn't have been higher than knee deep around him; it could only have rolled down from that section of the cave-in."

Several witnesses for appellees—businessmen, farmers, and laborers—testified that they examined the premises on Monday, after the accident on Friday; that the excavation was on the river bank; that the soil was "made soil," consisting of sand, gravel, and dirt that had been washed in by the river from time to time; and that they regarded the soil as being cavey, insecure, easily susceptible of caving, and calculated to cave. The evidence in no way explained why deceased had gone from the place he was instructed to work and was last seen about two minutes before the accident to the place where he was killed. Other than that, some of the braces of the timber wall were knocked down; there was no evidence as to what portion of the timber wall or braces had been defectively or improperly constructed. The undisputed evidence showed that the refilled dirt against the timber wall did not to any material extent cave, and that the south unbraced wall was the only wall that did cave.

█ This evidence did not show appellant corporation guilty of gross negligence in failing to furnish the deceased with a reasonably safe place to work. As above stated, the jury found that Weeks did not know "prior to the time of the accident that

the walls of the excavation were insecure and calculated to cave." Appellees are therefore compelled to rely upon their allegation and the jury finding that "Weeks, by the use of any care at all, could have anticipated that the wall of dirt would have caved in on" deceased. So, if Weeks were negligent, it was in not knowing and anticipating that the excavation wall would cave in, when, in the exercise of the care required to furnish deceased a reasonably safe place to work, he should have known and anticipated that the wall would have caved in on deceased. But the evidence failed as a matter of law to show that appellant was guilty of gross negligence merely because Weeks, its "vice principal" or "alter ego," failed to anticipate that the excavation walls would cave in on deceased. The undisputed evidence showed that the excavation was done under the method and in the manner commonly used in such work. The dirt was hard, and had to be picked all the way down. Dirt that has to be picked does not ordinarily cave. There had been no rain for several months. The ground was dry and hard. The walls of the excavation stood open for several weeks. All of the laborers who dug the excavation and did the work required therein testified that they saw no danger and considered the walls safe. There was no uneasiness felt nor expressed about the walls, and no one expressed nor communicated to Weeks any fear concerning the likelihood of the walls caving. Weeks did not attempt to brace any of the walls of the excavation itself, but only boarded the refilled dirt wall. These facts fall far short of showing a "conscious indifference" on the part of Weeks as to the welfare of deceased, which, under the rule above quoted, is necessary to show the master guilty of gross negligence.

It is true that Weeks knew of the conditions surrounding the excavation in question, and that he had known dirt which had to be picked to cave in some instances, but these instances were unusual and did not prove that he should have known that the wall in question might cave, nor that he should have foreseen the probability of its caving. His negligence, if any, was merely passive or negative, and proved only ordinary negligence. There was no proof of any fact or circumstance "which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of" deceased. Texas Pac. & Oil Co. v. Robertson (Tex.Sup.) 79 S.W.(2d) 830, 98 A.L.R. 262. Such fact or circumstance must appear before gross negligence is established.

The judgment of the trial court is reversed, and judgment is here rendered for appellant.

Reversed and rendered.