## SAN JACINTO BLDG., Inc., v. WASHINGTON.
### No. 3294.

Court of Civil Appeals of Texas. Beaumont.
Nov. 11, 1938.

Rehearing Denied Nov. 23, 1938.

John G. Tucker and Orgain, Carroll & Bell, all of Beaumont, for appellant.

W. J. Baldwin and Gilbert T. Adams, both of Beaumont, for appellee.

WALKER, Chief Justice.

San Jacinto Building, in the City of Beaumont, owned and operated by appellant, San Jacinto Building, Inc., is equipped with three elevators, from the Orleans street entrance numbered No. 1, No. 2, No. 3. It was the duty of L. J. Washington, a negro janitor in appellant's employment, and the other janitors, as they were assigned to this work, to clean these elevators each morning. January 22, 1936, about 6:15 o'clock, A. M., while cleaning these elevators, Washington fell down the shaft of elevator No. 2, and died from the injuries received by him in the fall. This suit was filed by appellee, Mary Lou Washington, surviving wife of the deceased, against appellant, San Jacinto Building, Inc., for "exemplary" damages for causing the death of her husband; for grounds of relief, she alleged that appellant was guilty of gross negligence in the following respects, each, constituting a proximate cause of the death of her husband: (1) Failure to have rules and regulations prohibiting the operation of the elevator while the employees were cleaning them; (2) failure to have a safety device to prevent the opening of the elevator door when the elevator was not in place; (3) maintaining the elevator doors so that they could be opened from the outside. On trial to a jury, all these issues, and all essential facts to convict appellant of gross negligence, were found by the jury in appellee's favor, and her exemplary damages were assessed by the jury at $2,000. As the deceased was covered by compensation insurance, appellee was not entitled to actual damages. All defensive issues were found against appellant. Other issues of gross negligence, plead by appellee, were submitted to the jury and, on the undisputed evidence, found in appellant's favor; on this statement, these issues pass out of the case. On the verdict, judgment was entered in appellee's favor against appellant for the sum of $2,000. The appeal has been duly perfected to this court from the judgment of the lower court.

We give the following testimony of the witnesses, questions and answers reduced to narrative: Allen Thomas testified:

"My name is Allen Thomas. I live at 1134 Ashley Street, Beaumont, Texas. On the 22nd day of January, 1936, I was working as a janitor in Beaumont for San Jacinto Building, Inc. I knew L. J. Washington, another janitor who was also employed by San Jacinto Building, Inc., and was working with him on that day on elevator No. 1, about 6:15 A. M., in the lobby of the San Jacinto Building, cleaning the ele-

vators. He was shining the brass on the inside of elevator No. 1 and I was shining the brass on the outside of that elevator. It was our duty to clean these elevators. He stayed on the inside of elevator No. 1 until he got through with his brass, then he opened the door and came on out; told me 'I am going to leave it with you; I am going to the next one.' I says, 'Okay; I'll be with you in a minute.' He went on to elevator No. 2. Well, the next thing that I knew, I was shining brass, and he opened the door, and the next thing I knew I heard a noise. You see when you turn that door loose like that, it slams hard on account of that spring; and I looked around and he was missing. The next thing, I heard him hollering down below the basement. I ran on down the stairway to the basement and told Mr. Martin about it. I met him down in the basement and told him that Leonard had fell through. We were working in the lobby of the building, and, when we began working, elevators No. 2 and No. 3 were on that floor, ready to be cleaned. Adam Lily, another janitor, moved elevator No. 2; took it to one of the upper floors. When Adam Lily moved elevator No. 2 he came out of the basement and when he got up to the street floor, he opened the elevator and says, 'Well, I'm going up.' I don't know whether Leonard heard it or not; Leonard was on the inside of No. 1. The door to elevator No. 2 was closed. I told him, I says, 'Well, go ahead; we'll see you.' I don't know whether Leonard heard it or not, because he was on the inside. In the lobby, we open the elevators from the outside in the following manner: Well, we've got a little rod there; they call it a key, and there is a little hole, about three eighths inch, or something like that; and you put that key in that hole and raise up on the outside, and that makes the end that is on the inside go down, and breaks that arm down right in there, and the arm pulls the door back about that wide (indicating), and you slip your hand in there and shove it back with your hand. Then we step into the elevator. In the morning when we go to work, the light is not on in the elevators. When we step into the elevators, we throw the switch and turn the light on; that is what we did to elevator No. 1 that morning. The elevators on the other floors of the building are not opened with that rod; only on the main lobby floor. That morning Adam Lily was cleaning floors, and was running about thirty minutes late. Roughly estimating, it is about twenty feet from the

main lobby floor to the bottom of the pit of the No. 2 elevator. Washington fell from the main lobby floor down that shaft to the bottom, about twenty feet. Elevator No. 2 is the only one that goes to the basement. When Washington opened the door to elevator No. 2, that elevator was just around the 5th or 6th floor of the building. The elevator doors on the main lobby floor, whether the elevator is there or not, can be opened with that key. When Washington and I went to work that morning, I don't remember who opened the door to elevator No. 1, but I imagine he opened it because he worked on the inside. He knew how to get the key and to open the door. He entered elevator No. 1 and didn't fall. After that, I heard Adam Lily say he was going to take No. 2 up; I didn't warn Washington because I took it for granted that he heard it. I saw him go and get the key but I didn't see him when he opened the door; no more than when I heard the noise I knew something had happened. After Washington fell down into the pit, we found the key at the bottom of the pit. After you open the elevator door, you can look in and see whether or not the elevator is there. The lobby lights were on that morning and gave a good light. Adam Lily was working there just like me and Washington, and he didn't have any charge over us. They took Washington to the hospital. That night I walked in there and asked him how he felt, and he said pretty good. He told me, he says—let's see now—he says, 'Well, boy, when I get well, I'm going to let you work on the inside.' I says, 'All right, Leonard, I'll be glad to.' He says, 'I fooled around there and got careless and fell through there, but I'll let you have it from now on.' Where you stand to open the elevator door is about four inches from the door; if you make a step and step over there, you get overbalanced and fall down. The elevator shaft is dark during the morning; you can't see the back until you turn the light on. I mean, if you stand close enough to the elevator shaft and the elevator isn't there and you get careless and step in without looking, you will fall."

J. M. Pugh, the building engineer, testified:

(A) On the issue of rules: "On the morning Washington was injured, the building did not have in force any rules and regulations prohibiting the use of the elevators while they were being cleaned. It was as-

sumed when an elevator was being cleaned, that it naturally wouldn't be used. The company had rules and regulations with reference to the operation of these elevators, but the rules were not printed. They just had general rules; they were to all the employees with regard to the operation of the elevators; no particular rules. The rules were that the elevators were to be cleaned; and they were, of course, if anyone was cleaning an elevator, if someone comes up to take the elevator away, the operator would naturally know about it, and would not continue the cleaning on the elevator, because the elevator wouldn't be there. We had no written rules; we have rules, of course. I don't recall all of them; though I couldn't recall them, I think, perhaps, the boys could. Since the rules were not written, I couldn't recall all of them."

(B) Count of the users of the building: "At one time the employees made a count of the number of people who visited the building—came in and out; the count amounted to about 60,000 or 65,000, over a period of a week. That count was taken about five years ago—about seven years ago; before the depression, along in 1929. The count represented the traffic hauled on the elevators, both up and down on interfloor traffic; about 65,000 people in a week —that might represent one person several times during the day. This is a public office building in Beaumont. Doctors and lawyers and other people have offices there. Sick people come there and visit the doctors; some are helpless and some are blind; lots of children come up from time to time."

(C) Operation of elevators: "There are three elevator doors on each floor of the building. Elevators No. 1 and No. 3 have sixteen floor landings; for elevator No. 2, there are seventeen floor landings. The elevator doors open from the inside; the elevator doors on the lobby floor open on the inside, but they can be broken—opened— from the outside. There is a hole in the doors, and through this hole they can be opened. The hole was put there by the manufacturer, as in all elevators. I haven't examined the elevator doors in the Goodhue Building and the American National Bank Building and couldn't say that they can be opened from the outside. The company furnishes a rod about the size of a lead pencil with which to open these doors. This rod could be called a key. On the morning he was injured, Washington's duties were to clean about the elevators in the lobby; to perform that duty with the equipment furnished by the company. This key was furnished by the company to open the door; he was also furnished rags and polish. If he had failed or refused to work with any of that equipment he would have been discharged. The doors of the elevators on the lobby floor had been opened in the method I have described since the installation of the elevators in the building, a little over thirteen years ago. During all the thirteen or fourteen years this building has been operated, no other man ever took that key off of the door and put it in there and stepped in that elevator shaft except Washington and one other party. All of the people who have used these elevators, these two are the only ones that did that. During all the time these elevators have been in operation no one has made complaint to me that the method of opening the elevator doors on the first floor from the outside was dangerous; I didn't consider it dangerous. When the elevators were on the first floor, we got into them by inserting this key into the hole in the door and by breaking the arm down and pushing the door open. This key is a long rod about eighteen inches long, and about one-quarter or three-eighths of an inch in diameter. The key is inserted in a hole that goes through the door, and breaks down a stiff arm on the inside of the car; then get behind the door and push it open. The key is kept in the lobby; If we had no way of getting into the elevator from the outside, with our three elevator doors shut and closed, we would just have to break the door down, I imagine, to get it open. The elevators I have worked around have had some way by which they could be opened on the main floor if all of them were closed. That has been my experience with elevators in buildings where I have worked. Based on my nineteen years' experience as a building operator, I would say that it is not customary to build and equip elevators so that when the doors are closed on the main floor they can't be opened without breaking the door down— they always build them so that they can be opened on the first floor."

(D) Injury to one other employee: "One other employee fell through this same elevator in the same fashion. That was about a year ago. I was manager at that time. The boy who fell through the door before the time Washington was injured did not file suit against the company; he wasn't injured."

A. S. Hollis testified: "My name is A. S. Hollis. For three years I have been operating engineer of the Goodhue Building here in Beaumont. I am acquainted with the operation of the elevators and the elevator doors in that building. All the doors open on the inside. The elevator doors of that building cannot be opened from the outside without being broken. They do not have a hole through which you can push a rod through the lobby door and break down the arms and open the door. We operate one elevator all of the time; in the event one door gets closed, we open it from the elevator in operation—from the inside and not from the outside. If all three of the elevator doors are closed at the same time, there is no way to get in except to break down the doors. I am not very well acquainted with the elevator doors in the American National Bank Building. I don't think they can be opened from the outside, but I am not positive. I am not very well acquainted with the elevator doors in the Gilbert and Perlstein buildings."

P. C. Martin testified: "There is some machinery in the pit of the No. 2 elevator, angle irons and bumpers; there is a pulley in the center."

After describing the manner of opening the elevator doors with a key, as did the other witnesses, this witness continued: "When the key is inserted it requires some pressure to push the arm down; it works against a spring. When you push this rod straight in, you have to push up on the outside, which causes the arm to go down. That cracks the door open; then you have to get behind it and push it open. * * * In the lobby, there is a dial up above the elevator which shows where the elevator is situated."

Appellee made the following admission: "Plaintiff states in open court that L. J. Washington knew that the doors could be opened from the outside, and that he, as an ordinary man, knew of the dangers incident to the opening of an elevator door when the elevator was not in position at the door, and that L. J. Washington did not ascertain that elevator No. 2 had been moved before attempting to clean it."

## Opinion.

It is our conclusion that the evidence submitted to the jury did not raise against appellant the issues of gross negligence. In Magnolia Petroleum Co. v. Ford, Tex.Civ.App., 14 S.W.2d 97, writ of error refused 118 Tex. 461, 17 S.W.2d 36, the court discussed, and contrasted, "ordinary" and "gross" negligence; on the issue of gross negligence as it related to the facts of that case, the court said [page 101]: "All that has been said would be true, we think, were we considering only a question of ordinary negligence; but what is there in the entire evidence to remotely suggest that appellant by its act in reaming out the set collar to make it fit a larger shaft exercised such 'entire want of care which would raise a presumption of a conscious indifference to consequences'? What was there in such act as to 'raise the belief that the act * * * was the result of a conscious indifference to the welfare' of the deceased? By the only reasonable interpretation of the evidence the very operation by which the set collar was reamed out was the same one by which the support and collar were threaded to make them more secure against slipping and thereby better to accomplish their intended purpose. This very act itself evidencing some care takes the transaction out of the definition of gross negligence. We doubt if gross negligence could possibly exist under the general circumstances of the case, as disclosed by appellee's evidence, in the absence, among other things, of (a) certain knowledge on the part of appellant that the deceased would rest the entire weight of the table so as to be supported alone by the strength of this collar; (b) that the collar in such case was so weakened by the reaming out process that it would break; and (c) certain knowledge that deceased would place his body under the table. We doubt if, in the absence of a concurrence of all these three things, there could be shown an entire want of care indicating a conscious indifference to the safety of employees. At any rate, some of these facts would have to be present and so far as we can see there is none."

Discussing the term "conscious indifference" as used by the court in the Ford Case, the Commission of Appeals, speaking for the Supreme Court in Texas Pacific Coal & Oil Company v. Robertson, 125 Tex. 4, 79 S.W.2d 830, 98 A.L.R. 262, said [page 831]: "It is to be observed that the definition quoted uses the words 'conscious indifference,' thus stressing the mental attitude of the person charged to have been grossly negligent. Gross negligence is positive or affirmative, rather than merely passive or negative as ordinary negligence of-

ten, and perhaps usually, is. As said·in the discussion in Ruling Case Law of the right to recover exemplary damages for gross negligence: 'The rule is that recovery is permitted, in, and confined to, cases where the negligence is wilful, or where it is so gross as to indicate wantonness or malice.' 8 R.C.L., p. 590. Mere indifference is not enough. The indifference must be conscious. The indifference is to the rights or welfare of the person or persons who may be affected by the act or omission."

In the case at bar appellee rested under the burden not only of establishing ordinary negligence, that is, that appellant failed to use ordinary care—that degree of care which a person of ordinary prudence would have used under the same or similar circumstances—but she was required to go further and show that appellant exercised such "entire want of care which would raise a presumption of a conscious indifference to consequences."

We have grave doubts that the evidence in this case, on the issues submitted to the jury as constituting gross negligence, even raised against appellant the issue of ordinary negligence. We review these issues as follows:

(A)·Gross negligence in failing to have rules and regulations prohibiting the operation of the elevators while the employees were cleaning them:

Mr. Pugh was the only witness on this issue. There was no testimony controverting his statement. Whether or not they had rules was immaterial for the evidence did not show a necessity for rules regulating the cleaning of the elevators. There was no showing that a rule regulating any element of the cleaning of the elevators could have contributed to Washington's safety. He knew his work and was an experienced janitor. He knew how to open the elevator doors, and how to step on the inside, and how to turn on the lights. He knew where the key was, and how to use it, and that the elevator could be moved from the lobby floor while the door was shut. He knew the depth of the elevator pit, and the risk of falling into it. No rule that appellant could have promulgated would have added anything to Washington's knowledge of the dangers inherent in his employment. The rule contended for by appellee would have interfered with the work of cleaning the upper stories of the building. Without the elevator, how would Lily have reached the

sixteenth floor of the building·on the morning Washington was hurt? Of course, he could have walked up to· the fifth floor, and to the sixteenth floor. Can ·it be said that appellant was guilty of "conscious indifference" to Washington's safety, and the safety ·of the other janitors who were assigned to the task of cleaning the elevators, by not promulgating the rule contended for by appellee? On the facts of this case—facts showing that, before Lily moved this elevator, he informed Thomas, who was working with Washington, that he was "going up" in elevator No. 2, and that the indicator showed the location of the elevator—the authorities cited above do not sustain that construction of the evidence.

Appellee cites as controlling, Ft. Worth Elevators Co. v. Russell, 123 Tex. 128, 70 S.W.2d 397; Morton Salt Co. v. Wells, 123 Tex. 151, 70 S.W.2d 409. We have given these authorities our most careful consideration, but they announce no principle of law convicting appellant of gross negligence on the facts of this case. There was no testimony raising the issue that other companies operating office buildings had rules on this point. The evidence is conclusive that appellant exercised proper caution and care in training its janitors for the job that Washington was on, and that Washington was an experienced and trained janitor. On the evidence, we say that, in failing to promulgate the rules contended for by appellee, appellant was not guilty of that conscious indifference to the rights of others necessary to convict it of gross negligence. On this point, as it relates to ordinary negligence, in Merchants' & Planters' Oil Company v. Burns, 96 Tex. 573, 74 S. W. 758, our Supreme Court [page 761]:

"There was no testimony given by anyone versed in the business that other precautions than those already taken by the company were necessary, or commonly practiced by persons engaged in like business. The effect of the charge of the court was to submit to the jury, without evidence, to determine the question whether or not it was necessary and the duty of the oil company to furnish a special watchman on this occasion. This is not a matter of common knowledge, which the jury might decide without evidence, and upon their own observation of the ordinary affairs of life. Morgan v.·Railway Co., 133 N.Y. [666] 669, 31 N.E 234; Larow v. Railway Co., ·61 Hun 11, 15 N.Y.S. 384. In the last case the court said: 'The effect

of this instruction was to submit to the jury the question whether a certain rule should have been made and promulgated by the defendant, without any proof whatever as to its practicability, or that any similar rule had ever been adopted or followed by any other railroad company in the management of the engines and cars in its yards. In other words, the plaintiff was permitted to suggest a rule for the management of the business of railroads, which, so far as appears from the evidence, was not shown to be either in use or practicable; and the court then submitted the question of its propriety to the jury, that it might, by guess or speculation, determine whether such a rule was proper, and, if so, might find that the defendant was negligent in not having adopted and promulgated it."

See, also, 18 R.C.L. 537; Medlin Milling Co. v. Mims, Tex.Civ.App., 173 S.W. 968.

(B) Gross negligence in failing to have a safety device to prevent the opening of the elevator door when the elevator was not in place:

The same legal principles controlling proposition (A), supra, acquit appellant of this charge of gross negligence. These elevators had been in operation for more than thirteen years. There was no evidence that the method used in opening the doors was not a recognized method of elevator equipment. There was no evidence that the key and the hole in the door constituted a dangerous method of opening the door. True, there was evidence that one building in Beaumont had different equipment. But there was no evidence that that building was safer to operate than appellant's building, or that its equipment conformed more accurately to the standard methods of equipment, or that appellant's construction had ever been condemned or even criticized. As this issue relates merely to ordinary negligence—and the proof must go much further to establish gross negligence—we quote as follows from Johnson v. Murray Company, Tex.Civ.App., 90 S.W.2d 920, 926: "Negligence for use of a dangerous plan or design in making a chattel or machinery cannot be predicated alone upon the fact that other manufacturers of the same kind of machinery constructed or made it differently."

In the case at bar, appellant had no certain knowledge—an element strongly stressed in the Ford Case, supra—that the deceased, a trained janitor, would step into the open shaft, and that a fellow servant would take away the elevator leaving the shaft exposed, or that Allen Thomas would not advise Washington that the elevator had been moved. Certainly, the evidence in this case does not convict appellant of that "entire want of care which would raise a presumption of a conscious indifference to consequences." See, also, Southwestern Sewer Company v. Cross, Tex.Civ.App., 93 S.W. 2d 202; Robertson v. Magnolia Petroleum Co., Tex.Civ.App., 255 S.W. 223; Tracey v. Wichita Ice Company, Tex.Civ.App., 30 S.W.2d 673; Pfeiffer v. Green, Tex.Civ. App., 102 S.W.2d 1077.

(C) Gross negligence in maintaining the elevator doors so that they could be opened from the outside:

On the authorities cited and reviewed above, we conclude that the evidence on this point did not raise against appellant the issue of gross negligence.

Against our conclusions, appellee advances the following argument: "It is undisputed that this situation could have been remedied after the first accident and thereby L. J. Washington's life would have been saved. The appellant had actual knowledge and actual notice of the danger and it failed to remedy the situation; it omitted the use of ordinary care in that it could have stopped said elevators in the basement below the main floor lobby instead of operating the elevator doors so that they could be opened in the basement where there was no traffic. As a matter of fact, other buildings in the city of Beaumont have their elevator doors so constructed that they cannot be opened from the outside, and this is as it should be. Because the statute specifically provides that 'It shall be unlawful after the 1st day of. January, 1926, to operate passenger elevators for the carriage of passengers in any building within this State until the same shall be equipped with a device that will prevent moving said elevator when the gate or door thereto is open.' Article 6145a, Rev.Civ.Stat. [Vernon's Ann.Civ.St.]

"A violation of this statute renders the offender liable to a fine, and each day the elevator is operated without such safety device constitutes a separate offense. Penal Code, 1925, Art. 1661a [Vernon's Ann. P.C. art. 1661a].

"The undisputed evidence in this case shows that this elevator door could be opened while the elevator was in the top of the building, on the sixth floor, on the tenth floor or anywhere in between, whether it

was moving or stationary; therefore, said elevator could be moved when the gate or door thereto was open.

"The appellant attempts to circumvent the remedial effect of this statute, which is purely a statute enacted for the safety of the public and employees, by attempting to show that when the elevator was in place at the door and the door was open, the elevator would not move; which is as it should .be. But the beneficent effect of this statute was emasculated when the defendant operated the main lobby doors to the elevators with holes through which any instrument the size of a pencil could be inserted and the doors thereby opened from the outside, even though the elevator might be in actual operation and movement."

Under the undisputed evidence, and the jury so found, appellant complied strictly with the provisions of Art. 6145a, Vernon's Ann.Civ.St., cited by appellee. The general public and appellant's employees were the beneficiaries, literally and absolutely, of "the remedial effect of this statute." That the elevator door could be opened, while the elevator was in the top of the building, has no application to Art. 6145a, Vernon's Ann. Civ.St., nor to Art. 1661a, Vernon's Ann. P.C.

From what we have said it follows that the judgment of the lower court must be reversed and the judgment here rendered for appellant, and it is accordingly so ordered.

Reversed and rendered.