## PFEIFFER v. GREEN.

## BLEDSOE v. PFEIFFER.

### Nos. 3024, 3059.

Court of Civil Appeals of Texas. Beaumont.

Feb. 25, 1937.

WALKER, Chief Justice.

By the concrete highway connecting the two cities, the city of Beaumont is about 18 miles from the city of Port Arthur; Nederland is a small town on this highway about 10 miles from Beaumont. On the 10th day of November, 1934, Miss Pfeiffer, with Miss Helen Green and Miss Buelah Floye Bledsoe as her guests, was driving her Chrysler car from Houston, by way of Beaumont, to Port Arthur. She had passed Beaumont. At about 4 p. m., when within about 2 miles of Nederland, she had a head-on collision with a Buick car driven by

**1078**

O. M. Cuniff. Miss Bledsoe died as a result of the injuries received in the collision. Miss Green and Miss Pfeiffer both received serious injuries. Cause No. 3024, as styled and numbered above, was brought by Miss Green against Miss Pfeiffer for the injuries received by her in the collision, pleading the following acts of negligence against Miss Pfeiffer, submitted to the jury and answered as indicated:

"Special Issue No. 1A: Do you find from a preponderance of the evidence that danger of impact became apparent to defendant just prior to the collision?"

Answer: "Yes."

"Special Issue No. 2A: Do you find from the preponderance of the evidence that just prior to the collision, defendant drove her car at such excessive rate of speed that she was unable to control same upon danger becoming apparent?"

Answer: "Yes."

"Special Issue No. 3A: Do you find from the preponderance of the evidence that defendant's act, if any, in driving said car at an excessive rate of speed, if any, was in reckless disregard of plaintiff's rights?"

Answer: "Yes."

"Special Issue No. 5: Do you find from the preponderance of the evidence that just prior to the collision defendant drove her automobile to her left of and across the center of the road?"

Answer: "Yes."

"Special Issue No. 6: Do you find from the preponderance of the evidence that at such time such road to the left and immediately forward of defendant's car was occupied by another automobile?"

Answer: "Yes."

"Special Issue No. 8A: Do you find from the preponderance of the evidence that the act, if any, of defendant in attempting to pass another car traveling in the same direction as defendant, if you have so found at a time when said road to the left and immediately forward of defendant's car was occupied by another car, if it was so occupied, was in reckless disregard of plaintiff's rights?"

Answer: "Yes."

"Special Issue No. 10: Do you find from a preponderance of the evidence that immediately prior to the collision defendant attempted to pass to the left of another car traveling on said road in front of defendant and going in the same direction that the defendant was traveling?"

Answer: "Yes."

"Special Issue No. 11: Do you find from the preponderance of the evidence that at the time defendant attempted to pass to the left of another car going in the same direction as defendant (if you have so found) such road to the left and immediately forward of defendant's car was occupied by an automobile going in the opposite direction to defendant?"

Answer: "Yes."

"Special Issue No. 13A: Do you find from the preponderance of the evidence that the act, if any, of defendant in attempting to pass another car traveling in the same direction as defendant, if you have so found, at a time when said road to the left and immediately forward of defendant's car was occupied by another car, if it was so occupied, was in reckless disregard of plaintiff's rights?"

Answer: "Yes."

"Special Issue No. 15: Do you find from the preponderance of the evidence that defendant's act, if any, of attempting to pass to the left of another car going in the same direction as defendant (if you have so found) occurred when said road was congested with traffic?"

Answer: "Yes."

"Special Issue No. 17: Do you find from the preponderance of the evidence that defendant's act, if any, of attempting to pass to the left of another car going in the same direction as defendant at a time when such road was congested with traffic (if you have so found) was in reckless disregard of plaintiff's rights?"

Answer: "Yes."

"Special Issue No. 23A: Do you find from the preponderance of the evidence that the act, if any, of defendant in driving her automobile to the left of and across the center of the road (if you have so found) occurred at a time when defendant failed to keep a proper lookout to determine whether or not her left hand side of the highway was clear and free from traffic?"

Answer: "Yes."

"Special Issue No. 25A: Do you find from the preponderance of the evidence that the act, if any, of defendant in driving her automobile to the left of and across the center of the road (if you have so found) at a time when she failed to keep a proper

lookout (if you have so found) was in reckless disregard of plaintiff's rights?"

Answer: "Yes."

The jury also found that these several acts of negligence constituted "proximate cause." The issues of negligence were submitted to the jury under the following general instructions:

"'Negligence', as used in the court's charge, means the doing of that which an ordinarily careful and prudent person would not have done, or the failure to do that which an ordinarily careful and prudent person would have done, under the same or similar circumstances.

"The phrase 'Reckless Disregard of Plaintiff's Rights' means more than simple negligence as above defined. Such phrase means something in the nature of a continued or persistent course of action over the protest of the guest and is not confined to mere momentary thoughtlessness, inadvertence or error of judgment.

"'Proximate Cause', as herein used, means that cause which in natural and continued sequence unbroken by any new and independent cause produces the result complained of, and without which that result would not have occurred, and in the light of the attending circumstances such result of a similar one ought to have been foreseen by a person of ordinary care and prudence.

"A 'New and Independent Cause' is an intervening efficient force which breaks the causal connection between the original wrong and the injury. Such new force must be sufficient of itself to stand as the cause of the injury and be one but for which the injury would not have occurred. The term 'New' refers to and means a cause incapable of being reasonably foreseen by the original wrongdoer by the use of ordinary care on his part; and the word 'Independent' refers to and means the absence of the relation of cause and effect between the new cause and the original wrongful act or omission; and, unless the intervening cause is thus both new and independent, sufficient of itself to stand as the cause of the injury, breaking the causal connection, the original wrongdoer is not relieved from legal responsibility for his wrong or negligence."

On the verdict of the jury judgment was rendered in favor of Miss Green for the sum of $4,169.50, the amount of damages assessed in her favor by the verdict.

Cause No. 3059, as styled and numbered above, was brought by the mother of Miss Bledsoe, pleading the same acts of negligence against Miss Pfeiffer as pleaded by Miss Green; Mrs. Bledsoe's case was submitted to the jury on practically the same evidence as the Green case, and on conclusion of the testimony a verdict was instructed in favor of Miss Pfeiffer. Cause No. 3024 was tried in the Fifty-Eighth district court of Jefferson county before Judge Geo. C. O'Brien, and cause No. 3059 was tried in the Sixtieth district court of Jefferson county before Judge R. L. Murray.

As the issues, both of fact and law, are the same in both of these cases, the appeals will be considered together.

The testimony of the witnesses, before us in question and answer form, will be reduced to narrative.

W. H. McGee, called by Miss Pfeiffer, testified as follows:

"My name is W. H. McGee. I live at Port Neches. I am employed by the Pure Oil Company at Smith's Bluff. I recall an automobile collision on the Beaumont-Port Arthur highway just this side of Nederland sometime around November 10th of last year. I was on the highway at that time, riding in a car. I was in a 1934 model Chevrolet Standard Coach. I was traveling from Port Neches to Beaumont. At the time of this collision I was on the paved highway this side of Nederland coming in the direction of Beaumont."

"I recall a Buick Sedan passing me just prior to the time this collision took place. That was just rather a short distance from the point where he passed me to the point the collision took place. At that point I was operating my car at a speed of between forty and forty-five miles an hour, about forty-three I judge. Several days later I learned who the driver of that Buick was which passed me; a man by the name of Cuniff. At the time he passed me going in the direction of Beaumont I was operating my car between forty and forty-five miles an hour; he was going at a greater speed then I was, much faster. At the time Mr. Cuniff passed me he was not only driving fast, he was driving on the left hand side of the highway, which would be the proper way to pass me; he drove for, oh, some little bit up the road before he ever cut back on his right side of the road.

"That road is about sixteen or eighteen feet wide, the paved part of it, I judge,

and then there are shoulders on each side. At the time the driver of this Buick, Cuniff, passed me two wheels of his car was on the pavement and two on the shoulder. Before he straightened back up in the road, before he cut back in the road, I saw a car coming; I couldn't tell you what kind it was. I saw the actual collision of the two cars. This fellow driving the Buick, when he passed me, seemed like he was rather crowded for room or something or another. I don't know whether he would have been or not if he had pulled his car back, but I believe I can truthfully say my four wheels skidded the length of the car to keep from having a collision myself. When he passed me (Cuniff) I saw a car approaching me. And this car that was going to Port Arthur from Beaumont had—I don't know, I didn't have any way of judging the speed they were traveling, but when they moved over to the center of the road, near the center of the road, it didn't seem like they were traveling a very fast rate of speed, and I just happened to think of it, that they were using pretty good judgment to give him ample room to pass on either side, as if this driver of the other car approaching him did not know which way he was going to go. He whipped the car back up on the pavement and I don't know whether he hit the edge of the shoulder or not; I couldn't truthfully say that, but he turned the car back; that hit the other car coming; they were just in pretty close quarters then, and I don't know what happened, but that Buick looked as big as this courthouse, turning in the air.

"The car coming towards me I later determined was a Chrysler. The Chrysler pulled over towards the center of the road. The last movement I saw this Chrysler made was to turn back to the right hand side of the road; to my left hand side; then the Buick cut me off; it was going I judge, oh, about a 45, coming across the road, going towards the left hand side of the road; I judge that would be the west side of the road. And the collision took place at that time. I judge I was about the length of this court room back of the Buick at the time the collision took place. I applied and slid my brakes; I stopped my car on the north side of the wreck, drove around it. No one else had arrived there at the scene of the accident at the time I stopped. I couldn't say that I saw this darkey that testified, Briscoe, there at the time of the accident, but there was a couple of negroes there, taking Miss Bledsoe out of the car; I found out later it was Miss Bledsoe; I didn't know any of them. I don't recall definitely whether he was there or not; I did see some colored man there though.

"I never examined his car a whole lot to find out how much of it was off the pavement, but I don't believe there was—he was headed back towards the way he was traveling from, towards Port Arthur, when the cars came to a standstill; his car was spun half around and the back end of it was resting somewhere near the door, about the middle of the door on this Chrysler on the right hand side; all the slack was taken out of the springs, it was raised way up in the air; both of them was on the right side coming this way. I did not notice any skid marks on the pavement there at the time of the collision."

D. S. Mallory, called by Miss Green and Mrs. Bledsoe, testified as follows:

"My name is D. S. Mallory; better known as Sidney. On or about the 10th day of last November I was employed at the Pure Oil Refining Company. I had worked there about a year and a half prior to that date. I recall that I punched out from work at four o'clock on that date. At that time I resided in Beaumont. I still reside in Beaumont. When I got off from work that day I started back to Beaumont.

"I had occasion to see a wreck, a collision between two cars in the Port Arthur-Beaumont highway that day. I couldn't say that I saw the cars when they jammed together; I was about three hundred yards behind the cars when they ran together; three or four. I went on to the scene of the accident; I was traveling in that direction. At the time when I first arrived on the scene of the accident there were very few people there; I was among the first to stop there; there was two or three cars stopped about the same time I suppose. I was driving my car that day. I drove up to this wreck immediately after it happened; you know I was driving around forty miles an hour myself, and it only takes a short while to cover three or four hundred yards; and I pulled up and parked my car directly in front of the wreck. I passed and pulled around it and stopped my car right in front of it and got out."

He testified further that he helped place Miss Green in a car and then continued his testimony:

"I noticed the condition of the cars at the scene of the accident while we were waiting for the ambulance. I know which car the ladies were in; they were in a Chrysler sedan. The other car was a 1934 model Buick Sedan. After the collision—the position of the cars, the Buick automobile was—had spun around—, the engine going around towards the ditch on the east side of the road, and was headed back towards Port Arthur, and it was on the lefthand side or east side of the road, headed back towards Port Arthur, and the back end of this car was hung up on the right side of the Chrysler, on the running board; the Chrysler was headed towards the ditch on the east side of the road, with the butt end of the Buick jammed right up perpendicular to the Chrysler; that is, the rear end of the Buick. After the collision these cars were on the left hand side—if you were traveling in the direction of Port Arthur, which I believe is the east side of the road. The Buick had two wheels on the left hand side of the car off in the ditch and two at the edge of the pavement, over on the shell, I should say, which is the shoulder of the road; and the Chrysler, the back end—the two back wheels of the Chrysler was just about the edge of the pavement on the east side of the road, with the front end wheels off in the ditch. I am familiar with that section of the highway; I drove it seven days a week for about two years. I should say the paved portion of that highway is sixteen feet wide with about two—ranging from two to four feet of shoulder on each side.

"The front end of the Chrysler was crushed from the center to the right hand side of the front, almost directly in the center of the Chrysler, being just a little to the right hand side you might say from the center of your automobile: this (indicating) is the Chrysler automobile, the engine setting towards the part there, almost centered with its lick on the Buick, from the center back to the right hand side, just demolishing that side of the Chrysler, and just turned it back like you would hit a mud ball with a hammer; and the Buick had the left hand side demolished. Just knocked the engine back like—take my hand; that Buick automobile standing straight, just knocked that engine back to the left, which made the Chrysler almost center the left hand wheel and fender of the Buick. The damaged place I have described on the Chrysler would then be to the right of the driver; it is on the right side from center to right of the Chrysler; and the injury or damage described to the Buick would be on the left or the driver's side."

Willie Briscoe, a negro, was called as a witness both by Miss Green and Mrs. Bledsoe; as his testimony for Mrs. Bledsoe is probably more favorable to the plaintiffs than that given in Miss Green's case, we give it in full:

"My name is Willie Briscoe. I live at Port Arthur. I have lived there since 1911. I have been working at the Gulf Refinery since 1911. On or about November 10th, 1934, I was on the Beaumont-Port Arthur highway. I was going back to Port Arthur, coming from Beaumont; I was traveling in a car. I was driving the car. I saw the wreck on that road that day. I saw it when it happened; I saw the two cars hit together.

"It was on our way going home and there was three white ladies passed our car and they passed by, we was on the right hand side, they passed on the left hand side of us, and they was going, and as far as I wasn't expecting no wreck to happen on the road that day, and they must have been about 100 or 200 feet ahead of us, and still going on the left side and I happened to look—I did not pay much attention, wasn't expecting no wreck—and when I looked again the cars had hit and both of them hit on the left hand side; I mean the left hand side going toward Port Arthur.

"The car with the three ladies in it drove around me. When they passed they was on the left hand side and it was about a hundred feet or two—in fact, I couldn't exactly say the distance, just being my idea about it from we-all, and they was still on the left hand side, but I wasn't paying any attention, happened to look up and I looked back and the two cars had hit together. I then make a jump out of my car and help assist the lady folks out of the car. I was the first car got there. I was right back of them. In about five or ten minutes other cars began to arrive. I couldn't say exactly in that time how many cars was there; cars back and forth, everybody stop and see the wreck. I couldn't tell how many cars, in about fifteen minutes twenty some-odd cars. More than that I reckon. There was a bunch of cars there in a short time. I was there when the ambulance came. I saw the folks put

in the ambulance and leave. I have been driving a car ever since I was a kid; twenty some-odd years. I can pretty well tell the rate of speed a car is making by seeing one come down the highway or pass me; to my idea they wasn't making more than thirty-five or forty miles. I was driving around thirty miles; they wasn't going very fast because they just passed ahead of me and had not left me very far. I was not very far behind them.

"I have testified about this before. I swore in this case before; in October of this year; that is, about this transaction. I seen them when they hit; that is my testimony now and was on the first, too. I didn't answer in response to your question in October that I didn't see the wreck; that I looked off, that they passed me, that I heard the collision and looked around and the cars were turned up; I saw the wreck all right. I saw both cars up together in the air. I seen it. Certainly I seen it. I could not keep from seeing it. They was together. They were together when I saw them. I saw it happen when they hit together. I saw them hit together. I happened to be looking up; they had both cars come down on the left hand side. I seen them both.

"After they passed me I just happened to cast my eye on the side, I didn't look off where I couldn't see the Pfeiffer car; the car was ahead of me. I just kind of looked off to the side a little; still the cars was ahead of me; I knew the car was ahead of me. I didn't lose sight of the car at any time. I wasn't paying no attention to the car. I could see the car all the time after it passed—like I saw out —I can see you looking through the window there, Judge; I could see the car. I was looking off still I had an eye on the car, still the car was running directly on the left hand side and when they hit they hit on the left hand side.

"They were about 100 or 200 feet ahead of me when they hit; I don't know which; I am just using my idea about this thing. It was further than this courtroom; about a block or half a block, something like that. It was just about 150 feet, I don't know, I did not measure it, I couldn't say. Might have been 75 feet, I don't know; just to my idea, according to my idea. I believe it was over 50 feet. I was driving toward Port Arthur, and driving slow, and this car passed me going about thirty-five or forty miles an hour, on my left. We rode behind them a piece, about a couple of blocks, something like that; and they were on the left hand side. I saw the other car coming. They hit and reared up on the left hand side of the highway and fell on that side. They fell off just about on the edge of the pavement. They fall a good bit, like; they just turned up and fell to the left and the car that was meeting me and the Pfeiffer car turned back towards Port Arthur, it was headed back toward Port Arthur.

"I could see another car way up ahead coming before the collision. I couldn't say how many feet or blocks away it was when I saw it coming; I was behind the other car; I don't know exactly how far it was. It was some distance up the road. When the car passed by me I wasn't expecting a wreck of that kind and the car went by, and when I looked up—looked back, the cars was together; I just kind of cast my eye off on the side, like you would cast your eye off. When the wreck occurred, I saw it when it happened. I was driving or riding with Cole; I was not driving myself, Cole was driving the car with me. It was a Model A Ford two-door coach."

Mrs. H. O. Harris, called by Miss Pfeiffer, testified that on the 10th of November, 1934, she was driving her car from Port Arthur to Beaumont; she did not see the collision between the Chrysler and the Buick car; her car was about seven cars behind the collision; she testified further, as follows:

"When I was coming on the road a person driving a large Buick automobile passed me just before I came to the scene of the collision, coming towards Beaumont; he passed me right a short ways out of Nederland. I was going along about thirty-five miles an hour and he passed me, he was going mighty fast, and there was a car coming in the other direction and he did not wait for it to get on by, he cut in right ahead of me and I had to swerve my wheels off the road onto the shell in order to keep him from hitting the front of my car. I am sure it was the same car I later saw wrecked; I could see him just going around one car after the other on up ahead of me, up the road; I am sure it was the same fellow; it was the same kind of car I saw there in the wreck. There was just one person in this large car when it passed me; a man. I have been driving an automobile about twelve years. I was going at the time about thirty-five miles an hour and when he passed

me he was going much faster; he was going around cars, one after the other."

Wallace McCasland, a funeral director and omnibus driver, testified that he drove to the place of the collision; that Miss Pfeiffer and Miss Bledsoe were placed in his ambulance and that he drove them to Port Arthur; that Miss Pfeiffer was conscious while she was in his ambulance; and while in his ambulance she made the following statements to him:

"She asked me time and time again, quite a number of questions, and was continuously talking, asked me these questions, which were where was the Green girl, if she was left at the wreck, and if she was hurt bad, and asked me also about the Bledsoe girl, which was in the car with us, if I thought she was dead or going to die, and also asked me quite a number of times who it was that she hit, run into, and asked me and told me, in fact—she wasn't necessarily telling me, but she was saying that she had—that the girls had said something to her about going too fast, had already mentioned that, and that they were in a hurry to get to the football game in Port Arthur. Those questions she asked me, as I said, a number of times.

"* * * She asked me about Miss Green several times, and also said something about they were in a hurry to get to Port Arthur to a football game. She said the girls had warned her about running too fast."

Mr. T. J. Day, called as a witness by Miss Green, testified that on the 10th of November, 1934, about 4 p. m. he was driving to his home in Beaumont; that out about 5 miles from Nederland, after passing Nederland, he met and passed an automobile which he afterwards identified as Miss Pfeiffer's car; that this car "was going at a rapid rate of speed," which he estimated at 45 miles per hour; that he "had to get off the highway to keep from getting hit"; that he "pulled over to the side and let her go by"; that he saw the car about 100 yards before he met it.

Miss Pfeiffer testified:

"My name is Louise Pfeiffer. I reside at Port Arthur. I am a teacher, in the Port Arthur High School. I have taught in the high school this year and last year; I have taught in the city schools this is the ninth year. I am a daughter of Pete Pfeiffer; commonly known, he is P. C. Pfeiffer.

"On November 10th I was in an automobile collision on the Port Arthur Road this side of Nederland. We had been to Houston. It was in my automobile. Miss Bledsoe and Miss Green were my guests; they had paid no fare or consideration that time; sometimes we shared on gasoline but I don't think we did that day; I don't recall. I invited them to go with me. It was on Saturday.

"I was injured in that wreck; I had a broken nose; hip that was cut and dislocated, left hip, with several pieces off of the bone of the left knee; my right foot was broken; four broken ribs on the left side, numerous bruises and sore all over, and knot on the back of the head.

"The last thing that I recall just prior to the accident was that I remember seeing the automobile coming down the road, or coming towards me; it seemed to be weaving down the road. I saw him pass several cars, and coming sort of this way (indicating) down the road, and that's the last thing I remember. He seemed to be coming rather fast. I just saw him coming down the road and saw him passing the cars, weaving down the road, and I thought he was driving as if he were drunk; that's the last thing I recall. * * *

"I don't know that I timed myself from Houston to Port Arthur. One time we had mentioned a football game and I had looked down at the speedometer, and at that time it was around thirty-five, but I hadn't consciously noticed the time. I didn't seem to be driving fast; I didn't feel that I was. I didn't come through Beaumont, I came out to Washington Boulevard; I didn't come through town at all. I have no recollection of how the collision occurred. I remember seeing a car coming towards me, and that's the last thing I can remember. I can't remember anything else about it. I don't recall that Miss Green or Miss Bledsoe warned me at any time that day that I was driving too fast on the Port Arthur road, but then they never did say anything to me about the way I drove. They had traveled with me frequently before. I couldn't name an exact time that they had accompanied me to Houston before, but I am sure that they had. I had driven them other places; to North Texas. I couldn't name offhand places, but we had made a number of trips. Miss Bledsoe was librarian."

Miss Green, plaintiff in cause No. 3024, testified:

"My name is Helen Green. I reside in Port Arthur. I am teaching school. I teach in the senior· high school there. I was so employed on or about the 10th day of November of last year. I left Port Arthur that day and went to Houston with Miss Louise Pfeiffer. We made the trip in Miss Pfeiffer's car. We started back to Port Arthur that day; I didn't get back to Port Arthur on that day. The last I remember we were passing through Beaumont—rather, the outskirts of Beaumont. The last time I looked at my watch it was around 4:00 o'clock. When I looked at my watch we were coming in, I think, somewhere around Washington Boulevard. We had not come through the city, through the business part, but through the outskirts. We had come across from the Houston highway to Washington Boulevard; to the south edge of Beaumont. I remember turning into Port Arthur Road from Washington Boulevard, yes. After we turned into the Port Arthur highway I remember a conversation about a purchase that was made that morning in Houston by Miss Bledsoe, and one remark made later by Miss Pfeiffer, but I don't remember anything else.

"I do not remember whether or not I was in a collision that day or not. I only remember only two incidents clearly from the time we left Beaumont; I don't know exactly how far out we were when I remember the first incident I recall took place; it was some time after we had turned into the Beaumont road. Miss Bledsoe had purchased a bottle of perfume and I hadn't seen it and she passed it back for me to see and I had handed it back to her. Miss Pfeiffer was driving, Miss Bledsoe was sitting in front with her, and I was sitting in the back seat. Shortly after the incident of the perfume, I don't know how long it was, but there was one other statement made. I wasn't paying very good attention to the road, and Miss Pfeiffer exclaimed, 'I can't make it'. The next thing I recall I was in Hotel Dieu some time Saturday night."

O. M. Cuniff was indicted by the grand jury of Jefferson county for operating a car while intoxicated upon the occasion in issue, and upon the trial was convicted by the jury, given a sentence of two years, with the sentence suspended.

The marks on the pavement made by the tires of the Chrysler car just before the collision corroborated in detail the testimony of Mr. W. G. McGee as to the relative position of the two cars at the moment of the collision.

## Opinion.

It is the contention of Miss Pfeiffer that the judgment against her in cause No. 3024 should be reversed and judgment here rendered in her favor; and that the judgment of the lower court in her favor in cause No. 3059 should be affirmed. After a most careful review of all the evidence in these cases, we have reached the conclusion that Miss Pfeiffer's contention must be sustained.

Miss Green and Miss Bledsoe were guests of Miss Pfeiffer on the occasion in question, riding in her car on her invitation, without any expense to them whatever. Under this statement, the plaintiffs in these two cases must recover, if at all, under the provisions of article 6701b, Vernon's Ann.Civ.Statutes, Acts 1931, 42nd Leg. p. 379, c. 225, which reads as follows:

"Section 1. No person transported over the public highways of this State by the owner or operator of a motor vehicle as his guest without payment for such transportation, shall have a cause of action for damages against such owner or operator for injuries, death or loss, in case of accident, unless such accident shall have been intentional on the part of said owner or operator, or caused by his heedlessness or his reckless disregard of the rights of others.

"Sec. 2. This act shall not relieve a public carrier or any owner or operator of a motor vehicle while the same is being demonstrated to a prospective purchaser, of responsibility for any injuries sustained by a passenger being transported by such public carrier, or by such owner or operator.

"Sec. 3. The fact under present law fraud may be perpetrated upon insurers of owners and operators of motor vehicles, creates an emergency and an imperative public necessity that the constitutional rule requiring all bills to be read on three several days in each House be, and same is, hereby suspended and that this act take effect and be in force from and after its passage, and it is so enacted."

This statute is a copy of an act of the Legislature of Connecticut (Gen.St. Conn.1930, § 1628). At the time the Texas Legislature adopted this statute, the courts of Connecticut had construed the language

"caused by his heedlessness or his reckless disregard of the rights of others" to mean gross negligence, as that term is defined in the jurisprudence of this state. Under a general canon of statutory construction, in adopting the Connecticut statute, our Legislature adopted the construction given the law by the courts of that state. 59 C.J. 1065; 9 Tex.Jur. 429, § 19; Travelers' Ins. Co. v. Marshall, 124 Tex. 45, 76 S.W.(2d) 1007, 96 A.L.R. 802. In fact, the courts of this state, in Napier v. Mooneyham, 94 S.W.(2d) 564, and Aycock v. Green, 94 S.W.(2d) 894, following Fly v. Swink, 17 Tenn.App. 627, 69 S.W. (2d) 902, which first construed our guest statute, have adopted the Connecticut construction. Under this settled construction, it is clearly the law that momentary thoughtlessness, inadvertence, or error of judgment does not constitute "heedlessness or reckless disregard of the rights of others" within the meaning of our guest statute.

So, the point at issue is, simply, whether or not, on the occasion in question, Miss Pfeiffer was guilty of gross negligence, which term was defined as follows by our Supreme Court in Missouri Pacific Ry. Co. v. Shuford, 72 Tex. 165, 10 S.W. 408, 411:

"Gross negligence, to be the ground for exemplary damages, should be that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it." Texas Pacific Coal & Oil Co. v. Robertson, 125 Tex. 4, 79 S.W.(2d) 830, 98 A.L.R. 262; Ford v. Magnolia Petroleum Co., 118 Tex. 461, 17 S.W.(2d) 36.

█ Under the facts of this case, Miss Pfeiffer was not guilty of gross negligence, as that term is defined in our jurisprudence. Conceding to the plaintiffs every possible inference arising on the testimony, nothing more was shown than momentary thoughtlessness, inadvertence, or error of judgment. These three girls were very close friends. They had taken many trips together, first in the car of one and then in the car of another.

If it be conceded that, between Washington boulevard and the place of the collision, Miss Pfeiffer may have driven too fast, the act of fast driving was merely momentary—a thoughtless act—and under all the evidence did not continue to the time of the collision. Under the testimony of all the witnesses who saw the collision, she was not driving more than 30 or 35 miles per hour at the time of the collision. If the speed of the car at that moment was negligence, it was nothing more than "the doing of that which an ordinarily careful and prudent person would not have done * * * under the same or similar circumstances," as the court defined the term negligence in his charge to the jury; it was not an act, which was the result of a conscious indifference to the right or welfare of her guests and closest friends, and there was not a scintilla of evidence in the record raising the issue of "conscious indifference" based upon the speed of the car.

There was no heedlessness or reckless disregard of her guests by Miss Pfeiffer, under the facts of this case, in passing Willie Briscoe's car just before the collision. Clearly, under the statement made by her at the very time, as testified to by Miss Green, "I can't make it," Miss Pfeiffer thought, when she undertook to pass Willie Briscoe's car, that she had time to pass the car and then pass back to her own side of the road before meeting the oncoming Cuniff car. That was nothing more than an error of judgment.

Mr. McGee, the witness to the actual fact of the collision, testified that, in his judgment, Miss Pfeiffer was driving carefully— in the center of the road—to give the drunken Mr. Cuniff an opportunity to pass on either side of her car. Mr. McGee was the only witness in position to testify with certainty as to the position of Miss Pfeiffer's car just prior to the collision. If, under the stress of the impending collision, she turned her car to the left, which, judged by the marks on the pavement, she did, her act was not one of heedless and reckless disregard of the rights of her guests, but nothing more than an error of judgment. She could not have been guilty of conscious indifference; her act, by force of necessity, was involuntary. She was in a position of great peril and, without time to think, turned her car to the left.

The legal weight of every fact and circumstance in this case on the issue of gross negligence was before the Connecticut courts in the cases reviewed in Fly v. Swink, supra, and determined against the contention of the parties. On the authorities cited above, we are forced to the conclusion that the plaintiffs in these two cases failed to make out a case of gross negligence against Miss Pfeiffer.

It follows that the judgment in Miss Green's favor must be reversed and judgment here rendered in favor of Miss Pfeiffer, and that the judgment in Miss Pfeiffer's favor against Mrs. Bledsoe must be affirmed, and it is accordingly so ordered.